## NELSON J. ELLIOTT v. SAMUEL SWARTWOUT.

Under the act of Congress passed on the 14th of July, 1832, entitled " An act to alter and amend the several acts imposing duties on imports," worsted shawls with cotton borders, and worsted suspenders with cotton straps or ends, are not subjected to a duty of fifty per centum ad valorem.

Laws imposing duties on importation of goods, are intended for practical use and application by men engaged in commerce; and hence it has become a settled rule in the interpretation of statutes of this description, to construe the language adopted by the legislature, and particularly in the denomination of articles, according to the commercial understanding of the terms used.

A collector of the revenue is not personally liable in an action to recover back an excess of duties paid, as collector, and by him in the regular or ordinary course of his duty paid into the treasury of the United States; he, the collector, acting in good faith, and under instructions from the treasury department, and *no protest being made at the time of payment, or notice not to pay the money over; or intention to sue to recover back the amount* given, him.

In case of a voluntary payment by mere mistake of law, no action will lie to recover back the money. The construction of the law is open to both parties, and each presumed to know it.

Any instructions of the treasury department to the collector, could not change the law, or affect the rights of a party injured by them. He was not bound to take and adopt that construction. He was at liberty to judge for himself and act accordingly. These instructions from the treasury seem to be thrown into the question in this case for the purpose of showing, beyond all doubt, that the collector acted in good faith. To make the collector answerable, after he had paid over the money, without any intimation having been given that the duty was not legally charged, cannot be sustained upon any sound principle of policy or of law. There can be no hardship in requiring the party to give notice to the collector, that he considers the duty claimed illegal; to put him on his guard, by requiring him not to pay over the money. The collector would then be placed in a situation to claim an indemnity from the government. But if the party is entirely silent, and no intimation of an intention to seek a repayment of the money, there can be no ground upon which the collector can retain the money, or call upon the government to indemnify him against a suit. It is no sufficient answer to this that the party cannot sue the United States. It is the case of a voluntary payment under a mistake of law, and the money paid over into the treasury; and if any redress is to be had, it must be by application to the favor of the government, and not on the ground of a legal right.

The collector is personally liable in an action to recover back an excess of duties paid to him as collector, and by him paid over in the regular and ordinary course of his duty into the treasury of the United States, he, the collector, acting in good faith, and under instructions from the treasury department, a *notice having been given him at the time of payment, that the duties were charged too high, and that the party paying, so paid to get possession of his goods, and intended to sue, to recover back the amount erroneously paid; and a notice not to pay over the amount into the treasury*

It is the settled doctrine of the law, that where money is illegally demandeded and received by an agent, he cannot exonerate himself from personal responsibility by paying it over to his principal, when he has had notice not to pay it over.

ON a certificate of division from the circuit court of the United States for the southern district of New York.

The suit was originally instituted in the superior court of the city of New York, by the plaintiff against the defendant, the collector of the port of New York; and was removed by certiorari into the circuit court of the United States.

The action was assumpsit, to recover from the defendant the sum of thirty-one hundred dollars and seventy-eight cents, received by him for duties, as collector of the port of New York, on an importation of worsted shawls with cotton borders, and worsted suspenders with cotton straps or ends. The duty was levied at the rate of fifty per centum ad valorem, under the second clause of the second section of the act of the 14th of July, 1832, entitled "An act to alter and amend the several acts imposing duties on imports," as manufactures of wool, or of which wool is a component part. The plea of non assumpsit was pleaded by the defendant in bar of the action :

The following points were presented during the progress of the trial for the opinion of the judges; and on which the judges were opposed in opinion:

First. Upon the trial of the cause, it having been proved that the shawls imported, and upon which the duty of fifty per centum ad valorem had been received, were worsted shawls with cotton borders sewed on; and that the suspenders were worsted with cotton ends or straps; and that worsted was made out of wool by combing, and thereby became a distinct article, well known in commerce under the denomination of worsted.

The judges were divided in opinion whether the said shawls and suspenders were or were not a manufacture of wool, or of which wool is a component part, within the meaning of the words 'all other manufactures of wool, or which wool is a component part,' in the second article of the second section of the act of Congress of the 14th of July, 1832.

Second. Whether the collector is personally liable in an action to recover back an excess of duties, paid to him as collec·

[Elliott v. Swartwout.]

tor; and by him, in the regular or ordinary course of his duty, paid into the treasury of the United States; he, the collector, acting in good faith, and under instructions from the treasury department, and no protest being made at the time of payment, or notice not to pay the money over, or intention to sue to recover back the amount given him.

Third. Whether the collector is personally liable in an action to recover back an excess of duties paid to him as collector, and by him paid, in the regular and ordinary course of his duty, into the treasury of the United States, he, the collector, acting in good faith, and under instructions from the treasury department; a notice having been given, at the time of payment, that the duties were charged too high, and that the party paying, so paid, to get possession of his goods; and intended to sue to recover back the amount erroneously paid, and a notice not to pay over the amount into the treasury."

These several points of disagreement were certified to this court by the direction of the judges of the circuit court.

The case was argued by Mr. Ogden for the plaintiff, and by Mr. Butler, attorney-general, for the defendant.

Mr. Ogden stated, that the question on the first point arose under the second clause of the second section of the act of Congress of 14th July, 1832, "to alter and amend the several acts imposing duties on imports." The language of that part of the section, after enumerating a number of articles on which a specific duty is laid, is " and upon merino shawls made of wool, or of which wool is a component part, and on ready-made clothing, fifty per cent. ad valorem." In the act, a duty of ten per cent. ad valorem is laid " on worsted stuff goods, shawls, and other manufactures of silk and worsted, and on worsted yarn, twenty per cent. ad valorem."

It is contended that the articles imported by the plaintiff do not come under the provision of the law which imposes a duty of fifty per cent. ad valorem on woollen goods; but that the duty is ten per cent. ad valorem, as they are *worsted goods*, or goods of which worsted is the principal component material.

Congress draw a distinction between worsted and woollen goods. These articles are worsted suspenders, with cotton ends. The shawls are worsted shawls, with cotton borders. Worsted is made of wool, but it undergoes a particular process of carding and combing. It becomes, by the process, " a distinct article."

The certificate of the judges states the fact, that although worsted " is made out of wool, by combing it becomes a distinct article, known in commerce under the denomination of worsted."

Congress are to be considered as using terms of art and commercial terms, as they are generally used and generally understood. This has been so decided in this court, in the case of the United States v. 200 chests of tea, 9 Wheat. 230. The question in that case was, whether certain tea was *bohea tea*. It was proved that the tea was, in the common language of commerce, called bohea tea; although it was not in truth so called in the country from which it was brought. If this settles the law of the case, it decides the question in the case before the court: for the articles upon which the higher duties are claimed, are not " wool" but " worsted," and well known in commerce under this denomination. It will then be for this court to say, on the first point; whether the articles are *wool* or *worsted*

The second point presents the question of the personal responsibility of the collector, on the payment of duties to him which he has illegally exacted. The duties thus demanded were paid by compulson. Unless paid, the goods would not have been delivered to the owner, and thus this became a compulsory payment. If the duties were not due, their payment gives no right to retain them.

3. The payment of the illegal duties gave the collector no right to them, and the collector cannot discharge himself by paying over the money. 1 Camp. N. P. 396. This was a case in which money was illegally claimed by overseers, and was paid over to their successors; but they were not protected from personal responsibility by the payment. If it was illegally demanded, it was illegally paid over by the collector. But in the point certified, the fact of a notice having been given that the duties were too high charged, is stated; and the collector was informed that an action would be brought against him to recover back the

[Elliott v. Swartwout.]

amount erroneously paid. It is a general principle of law, that, under such circumstances, the money may be recovered back.

The attorney-general, Mr. Butler, for the defendant.

On the first point it is insisted, on the part of the defendant, that the shawls and suspenders were a manufacture of wool, or of which wool was a component part, within the meaning of the words "all other manufactures of wool, or of which wool is a component part," in the second article of the second section of the act of congress of the 14th of July 1832. Laws of the United States, sessions 1832, p. 187. In support of which view of the subject, the following reasons are suggested, viz :

1. The articles in question do not come within the third article of the section above referred to, and are not manufactures of cotton, or of which cotton is a component part ; and therefore subject only to a duty of twenty-five per cent. ad valorem : but as the cotton borders and cotton straps are merely adjuncts or accessaries to the shawls and suspenders, the entire article is liable to the rate of duty imposed upon that component part, which is most essential for the formation of the entire article, and is of the greatest intrinsic value.

2. The duties upon the articles in question are therefore to be determined solely by the words and intention of the second article of said second section ; and as shawls and suspenders are not specifically enumerated, it is respectfully insisted, that they come within the general concluding clause.

3. The tariff act of May 22, 1824, § 1, vol. vii. p. 269, shows he understanding of congress, in their legislation upon the subject, to be, that *worsted* goods are *woollen* goods; else, why except worsted goods, eo nomine? for if they were not to be deemed woollen, they could not be included in a general clause relative to woollen, and the exception would be surplusage. Worsted goods, although made of wool which has undergone a different process, to wit, *combing*, from wool employed in various other manufactures; are still manufactures of wool. The case admits that it is wool prepared to a certain state ; and until it can be shown that any other raw material, as cotton, flax, &c. is usually manufactured into the intermediate stage denominated

[Elliott v. Swartwout.]

*worsted*, then it follows that worsted can have no existence, except as a manufacture of wool.

4. Whatever weight might, in a case of doubtful construction, be attached to the consideration, that *worsted* being made out of wool by combing, "thereby became a distinct article, well known in commerce under the denomination of worsted," no understanding, either of merchants or others, can countervail either the express language of a statute, or the meaning of the legislature to be derived from the language they have employed. The language and intention of the statute are so explicit as to preclude the admission of extrinsic evidence for settling their interpretation. In The United States v. Clarke, 5 Mason, 32. Judge Story clearly understands that an article composed of worsted is "a fabric of which wool is a component material." Faw v. Marsteller, 2 Cranch 23, shows that the general words of a law are not to be restrained by implication, "unless that implication be very clear, necessary, and irresistible." The United States v. Fisher, 2 Cranch 386. "Where the intent is plain, nothing is left to construction."

5. If congress had intended to discriminate between woollen and worsted, they would, in some manner, have expressed their intention, either by enumerating all the specific worsted articles subject to duty; or by introducing a general clause relative to *worsted* similar to that respecting *woollen*.

6. It is encumbent on the plaintiff to show that these goods were expressly excepted by some special provision of the law from the operation of the general clause; if no such exception shall be shown, these articles necessarily fall within the general clause, and are subject to a duty of fifty per cent.

7. Shawls and suspenders are not *worsted stuff goods*, within the meaning of the second article; as the term *worsted stuff goods* applies only to articles known in commerce as piece goods, and such as are sold by the yard.

On the second point, it is insisted, on the part of the defendant, that a collector of the customs is *not* personally liable in an action to recover back an excess of duties paid to him as collector; and, in the regular ordinary course of his duty, paid into the treasury of the United States; he, the collector, acting

[Elliott v. Swartwout.]

in good faith, and under instructions from the treasury department, and no protest being made at the time of payment, and no notice not to pay the money over, or intention to sue to recover back the amount paid, given him. Because,

1. No action lies to recover back money paid voluntarily, and without compulsion, where the party receiving the money is not guilty of fraud, and where both parties are equally cognizant of the facts upon which their rights depend. Gower v. Popkin, 2 Starkie 85; Fowler v. Shearer, 7 Mass. Rep. 14; Bilbie v. Lumley, 2 East. Rep. 469.

2. The collector being merely an agent, no action to recover back money will lie against him; in those cases in which an agent of any other description or character would not be liable.

3. An agent's liability to refund does not extend beyond that of his principal, where the payment has been made directly to him. Therefore, a voluntary and bona fide payment to an agent is the same, as regards the rights of the claimant, as if the payment had been made to the principal himself. It is *money had and received* by the agent to the use of *his principal;* and *not of the party paying it.*

4. The money having been received by the collector, in good faith, and having been paid over by him to the treasury, in the regular course of his duty, without protest or notice from the plaintiff, he is not liable to the plaintiff, even admitting that a voluntary and bona fide payment to the principal may, under any circumstances, be revoked. Saddler v. Evans, 4 Burr. 1985; Buller v. Harrison, Cowp. 565; Stevenson v. Mortimer, Cowp. 806.

5. The collector, being a revenue officer, cannot be called on to refund money which he has bona fide received in his official capacity; even if an ordinary agent might, under similar circumstances, be required to refund. An action for money had and received will not lie against a revenue officer for an overpayment. Whitebread v. Brooksbank, Cowp. 69.

6. The present action is, in effect and substantially, an action to *try a right;* that is, the right of the United States to claim duties upon certain goods, at a higher rate than admitted by the importer. A question of this nature, so far from being triable

in an action against the agent, cannot be introduced in an action for money had and received, wherein the person paying and the principal are the immediate parties. Lindon v. Hooper, Cowp. 414; Staplefield v. Yewd, Bull. N. P. 133; Potter v. Bermiss 1 Johns. Rep. 515.

On the third point, it is insisted, on the part of the defendant, that the collector is *not* personally liable in an action to recover back an excess of duties paid to him as collector, and by him paid in the regular and ordinary course of his duty into the treasury of the United States; he, the collector, acting in good faith, and under instructions from the treasury department, a notice having been given at the time of payment, that the duties were charged too high, and that the party paying, so paid to get possession of his goods, and intended to sue to recover back the amount erroneously paid, and a notice not to pay over the amount into the treasury.

The general propositions presented under the second point are fully applicable to the present; and it is therefore unnecessary to reiterate them, further than as may be necessary to show their applicability to this head.

The additional facts presented by this THIRD point do not vary the result, to which it is respectfully insisted the court must arrive, upon a consideration of the questions arising under the second point.

These additional facts do not vary such result, for the following reasons:

1. It was a voluntary payment; because the party making it was apprized, at the time, of his right to resist, or withhold payment; as the case expressly states, it was at the time of payment that notice was given that the duties were charged too high, and that the party paying so paid to get possession of his goods; intended to sue to recover back the amount erroneously paid, and gave a notice not to pay over the amount into the treasury. Brown v. McKinally, 1 Esp. Rep. 279; Greenway v. Hurd, 4 Term Rep. 553; Fulham v. Down, 6 Esp. Rep. 25 n; Mowatt v. Wright, 1 Wendell 355.

2. The plaintiff's notice of an intention to sue to recover back the amount *erroneously* paid, is inconsistent with the previous

[Elliott v. Swartwout.]

part of his notice, as stated in the case, to wit, " that the duties were charged too high." He was cognizant of all his rights both in fact and in law, and, if believing he was under no obligation to pay the money, he notwithstanding paid it, it is still a mere voluntary payment; for which, if he could have no claim against the principal, still less can he demand restitution of the agent.

3. Both parties were acting in good faith, and supposing that they understood their mutual rights. The plaintiff believing that he was not bound to pay duties at the rate demanded, and the collector believing that he was entitled to demand and receive at that rate, the plaintiff notwithstanding pays the demand. All pretence then of ignorance on the one part, of his rights, and of fraud and bad faith on the other, being expressly negatived; has the plaintiff shown any additional circumstance on which to support his action ? It is merely stated that " he so paid to get possession of his goods."

4. It is not denied that an illegal and compulsory payment may be the foundation of an action; but the payment must be *both* illegal *and* compulsory: admitting then that the collector misconstrued the law; or to speak more correctly, that he applied the law, as it had been construed by his official superiors; yet, in the absence of mala fides, it is necessary for the plaintiff to show fully and satisfactorily, that the payment was compulsory. It is not enough to allege that he paid the money to get possession of his goods; but he must show that the immediate possession of the goods was so necessary and urgent as not to admit the delay of a judicial or authoritative decision on the right. Ashley v. Reynolds, Str. 916. That a party might protect himself by a replevin; is an answer to an action for money had and received, under threat of a distress for rent, 1 Esp. Rep. 84.

The circumstance that in this case the plaintiffs had an option to give a bond for the duties, in a suit upon which the validity of the demand could have been put in issue; repels all idea that this was a compulsory payment.

5. Admitting that a party paying money to an agent under misapprehension, either of fact or law; may, after becoming aware of the mistake, treat the agent as a mere stake-holder, and

suspend the money in his hands, by a notice not to pay it over; yet in this instance there was no notice within the scope and meaning of the rule alluded to. The notice given was simultaneous with the payment; which was made knowingly and deliberately, and was received fairly and honestly. The cotemporaneous notice or protest, therefore, does not render it the less a voluntary payment.

6. Admitting that a notice given subsequent to payment, would, in the case of an ordinary agent or factor, detain the money in his hands; the rule does not apply to a ministerial officer of the government, who is bound to pay the money "*in the regular and ordinary course of his duty into the treasury of the United States*," and who has actually so paid it. See act March 2, 1799, § 21; 3 Laws U. S., p. 157. Upon receipt of it by him, he was, as regards the payer, functus officio. If he refuses or neglects to pay it into the treasury; the treasury alone can require it of him, and the payer must look to the government for reimbursement.

7. The collector is not an agent or factor, within the usual understanding of the term. He is a mere ministerial officer bound to receive what the law and the instructions of his superior require him to receive, and bound to pay over when, in what manner, and to whom the law and those instructions may direct. The peculiar character of a collector, as different and distinct from that of an ordinary agent, will clearly appear from an examination of the act of March 2, 1799, § 62, 65; 3 Laws U. S., 193, 198. He has no common law lien, either general or special, upon the funds in his hands. If a collector is liable to an action in a case like this, as well may a suit be brought against a merchant's clerk, who has received money on his master's account, to which the latter was not entitled.

8. Although it is not pretended that the command of a superior justifies the tort or trespass of his inferior, still the general policy of the law requires, that ministerial officers, and particularly officers of the revenue, should be protected where they have acted in good faith under the instructions of their superior; especially in those instances in which the law itself exacts an implicit obedience to those instructions.

[Elliott v. Swartwout.]

9. Such also is the general policy of the revenue laws of the United States; by which the direction and superintendence of the collection of duties is expressly delegated to the treasury department.

10. If it had been the intention of the plaintiff to resist the payment of duties, he ought, instead of paying the amount at the time, to have given a bond in the usual manner; and then in a suit upon the bond, he could have shown that the duties had been improperly liquidated. Ex parte Davenport, 6 Peters 661. The United States v. Phelps, 8 Peters 700. As he had an option in this respect, either to pay the duties, or to secure their amount, it follows, that the payment was voluntary; and there is therefore no reason why he should be allowed to litigate in a collateral action, and against a third person, questions which could be directly raised in a direct action between the parties in interest. If the plaintiff's object was to obtain immediate possession of his goods, and if such immediate possession was indispensable, the foregoing consideration negatives all idea that the money was exacted by taking an undue advantage of his situation.

Mr. Ogden, in reply, contended, that the true construction of the act of congress was, that these goods were to pay no more than the lowest duty. They were worsted—worsted stuff goods. The language of th section could only be fairly and reasonably so applied. The denomination of worsted, was to be carried on to shawls, so as to read worsted shawls. The article formed by combing the wool, and using it so as to make worsted from it, became essentially different from the original material. It was the change produced by the manufacture, which placed it on the list of articles subjected to a lower duty. The result of this process of manufacture was the subject of regulation by congress in another article, and a difference of duty imposed. Woollen yarn is subject to a duty of twenty per cent., while worsted yarn pays four or four and a half per cent. Paper is made from linen; but paper is not linen.

Upon the question of notice: was it necessary to give the collector notice? The collector was bound to know the law; and if by law the goods were not liable to the duty he insisted upon,

[*Elliott v. Swartwout.*]

he is liable, and can have no right to notice. It appears that the collector was instructed to demand the higher duties. While obedience to his instructions might give him a full claim to indemnity on the government, he is not the less responsible to individuals. Such instructions are no protection to him, when he violates the law.

It is said the case presented is that of a voluntary payment. A voluntary payment, which can be set up to prevent a recovery back of money paid, can only be where all the circumstances are well known to the person paying; and where no constraint exists, and a free and unlimited action is permitted, to make or refuse the payment. But in this case, the duties must be paid or bonds given for them, or the owner could not obtain his goods. He might be entirely ruined by not having the possession of the goods. He may have made contracts for their sale and delivery, the effects of a violation of which would be such as he could not sustain. The case stated in the points certified, is, that the money was paid to get possession of the goods. This was involuntary.

But it is said the collector was an agent. He is agent of the law, to carry its provisions into effect. He is not an agent for any illegal purposes; and he is bound to disregard instructions from the department of the government having charge of the collection of the revenue, if they are contrary to law. If a collector is an agent of the treasury, then he is not an agent of the law of the land.

The collector is responsible as a principal, when he compels the payment of duties; and he must answer to an injured individual for his actions. This is a responsibility from which he cannot escape.

A sheriff in levying an execution, is the agent of the plaintiff, but he cannot protect himself by this circumstance. He will not justify his proceedings by pleading the instructions of another.

It is said this is a question of the right of the government to compel the payment of duties. It is not such a question; but it is one whether the government has a right to collect excessive duties: whether, under the right to collect and compel the payment of actual duties, too much, more than the law authorizes, shall be exacted. Too much has been paid in this

[Elliott v. Swartwout.]

case, and, therefore, the action for money had and received is proper.

The suggestion that there was another remedy, that of an action of replevin, is not correct. Replevin would not lie. The right of the United States to retain the goods subject to duties, is indisputable; and until this lien is removed by the payment of the same; although the amount may not be certainly ascertained; the lien continues, and assures to the United States the absolute custody of them.

Nor is it admitted that a bond could have been given. The delivery of a bond would have been an admission that the goods were woollen goods; and thus the plaintiff would have been estopped from saying they were worsted. Without such a bond, the goods could not have been obtained; which would have been a surrender of the claim in this suit. But two modes of proceeding were presented. Either to take the goods, paying the duties claimed, and to institute an action to recover back the excess; or to let them remain in the hands of the collector.

Had an action of trover been resorted to, years would elapse before the termination of the suit: and, in the mean time, all the consequences of being kept out of the property would have been sustained. An application to Congress for redress might have been attended with the same delay.

The laws of the United States prescribe the form of bonds for duties; and although the description of the goods is not inserted in the bond, it is founded on an entry in which they are described; and, in this case, the defendant would have required they should be entered as woollen goods.

The attorney-general referred the court to the 62d section of the act of congress for the collection of duties. The provisions of this section, taken in connexion with those of the 65th section, provide for the correction of errors in the computation of duties. This court decided, in Davenport's case, 6 Peters, that these provisions are to be liberally construed. In 8 Peters 700, the court decided that a party was not estopped, by giving a bond, from claiming a reduction or alteration in the computation of the duties.

Mr. Justice THOMPSON delivered the opinion of the Court.

This is an action of assumpsit to recover from the defendant the sum of three thousand one hundred dollars and seventy-eight cents, received by him for duties as collector of the port of New York, on an importation of worsted shawls with cotton borders, and worsted suspenders with cotton straps or ends. The duty was levied at the rate of 50 per centum ad valorem, under the second article of the second section of the act of the 14th of July, 1832, entitled " An act to alter and amend the several acts imposing duties on imports," as manufactures of wool, or of which wool was a component part. Upon the trial of the cause, it appeared that the shawls imported, and upon which the duty of 50 per centum ad valorem had been received, were worsted shawls with cotton borders sewed on ; and that the suspenders were worsted with cotten ends or straps. And it appeared in evidence, that worsted was made out of wool, by combing, and thereby become a distinct article, well known in commerce under the denomination of worsted, and upon the trial, the judges were divided in opinion upon the following questions :

1. Whether the said shawls and suspenders were or were not a manufacture of wool, or of which wool was a component part, within the meaning of the words " all other manufactures of wool, or of which wool is a component part," in the second article of the second section of the act of congress of the 14th of July, in the year 1832.

2. Whether the collector is personally liable in an action to recover back an excess of duties paid to him as collector, and by him in the regular or ordinary course of his duty paid into the treasury of the United States ; he, the collector, acting in good faith, and under instructions from the treasury department ; and no protest being made at the time of payment, or notice not to pay the money over, or intention to sue to recover back the amount given him.

3. Whether the collector is personally liable in an action to recover back an excess of duties paid to him as collector, and by him paid over in the regular and ordinary course of his duty into the treasury of the United States ; he, the collector, acting in good faith, and under instructions from the treasury department, a

notice having been given him at the time of payment, that the duties were charged too high, and that the party paying, so paid to get possession of his goods, and intended to sue, to recover back the amount erroneously paid, and a notice not to pay over the amount into the treasury.

1. The act of 1832, in the section under which this question arises, after imposing a specific duty on a number of enumerated articles, concludes in these words: " and upon merino shawls made of wool, all other manufactures of wool, or of which wool is a component part, and on ready-made clothing, 50 per centum ad valorem." And the only question under this point is, whether worsted shawls with cotton borders, and worsted suspenders with cotton ends or straps, are manufactures of wool, or of which wool is a component part. It is stated in the point, as a fact, and to be taken in connexion with the question, that worsted is made out of wool by combing; but that it becomes thereby a distinct article, well known in commerce under the denomination of worsted.

Laws imposing duties on importations of goods, are intended for practical use and application by men engaged in commerce; and hence it has become a settled rule in the interpretation of statutes of this description, to construe the language adopted by the legislature, and particularly in the denomination of articles, according to the commercial understanding of the terms used. This rule is fully recognised and established by this court, in the case of two hundred chests of tea, reported in 9 Wheat. 438. The court there say, the object of the duty laws is to raise revenue, and for this purpose to class substances according to the general usage and known denominations of trade. Whether a particular article was designated by one name or another, in the country of its origin; or whether it were a simple or *mixed* substance; was of no importance in the view of the legislature. It applied its attention to the description of articles, as they derived their appellations in our own markets, in our domestic as well as our foreign traffic; and it would have been as dangerous as useless, to attempt any other classification than that derived from the actual business of human life. It being admitted, in this case, that worsted is a distinct article, well known in commerce under

that denomination, we must understand congress as using the term in that commercial sense, and as contradistinguished from wool, and woollen goods, and other well-known denomination of goods. The classification of the article in this section, shows that congress had in view a class of goods known as worsted goods, as contradistinguished from wool, and upon which a different duty is laid. A duty of ten per centum ad valorem is laid on worsted stuff goods, shawls, and other manufactures of silk and worsted, and on worsted yarn, twenty per centum ad valorem. If, because worsted is made of wool, all manufactures of worsted become woollen manufactures, there would be no propriety in enumerating worsted goods as a distinct class.

Suppose the shawls, in this case, had been without borders; they would then have been entirely composed of worsted. It could not, certainly, in such case, be pretended that they were manufactures of wool, if there is any distinction between worsted and wool. Nor would they be a manufacture of which wool is a component part. Such manufactures are, where the article is composed of different materials compounded; but these shawls, without the borders, would be entirely worsted, and no compound of different materials. And if the shawls, without the borders, would be worsted, and not woollen goods, the addition of a *cotton* border would not make them woollen. If the border had been wool instead of *cotton*, it might with some propriety be said, that wool was a component part. But adding cotton to worsted, cannot with any propriety be said to make the article woollen. The same remarks may be applied to the suspenders; adding cotton ends or straps to worsted suspenders, cannot make them woollen goods.

This view of the case, would be an answer to the question as put in the point. The court is not called upon to say what is the duty imposed by the law upon these articles, but only to say whether they are subject to a duty of fifty per centum ad valorem, as manufactures of wool, or of which wool is a component part. But as this question may arise upon the trial, it is proper for the court to express an opinion upon it. The question is certainly, as it respects the suspenders, not free from difficulty. The language of the act is obscure, and not susceptible of an in-

terpretation entirely satisfactory. There is no part of this section that will cover the goods in question, except that which imposes a duty of ten per centum ad valorem on worsted stuff goods, shawls, and other manufactures of silk and worsted. This duty is imposed upon shawls of some description, and none but worsted, would at all answer the denomination. Merino shawls, made of wool, are specifically enumerated and made subject to a duty of fifty per centum. The clause imposing the duty on worsteds may well admit of reading " worsted stuff goods and worsted shawls;" they are certainly not a manufacture of worsted and silk. It might be a proper subject of inquiry upon the trial, whether shawls of this description are usually denominated worsted shawls in the market, and if so, the rule of construction alluded to, would apply to the case. At all events, the answer to be given to the question as put, must be, that the shawls and suspenders are not a manufacture of wool, or of which wool is a component part.

2. The case put in the second point, is where the collector has received the money in the ordinary and regular course of his duty, and has paid it over into the treasury, and no objection made at the time of payment, or at any time before the money was paid over to the United States. The manner in which the question is here put, presents the case of a purely voluntary payment, without objection or notice not to pay over the money, or any declaration made to the collector of an intention to prosecute him to recover back the money. It is therefore to be considered as a voluntary payment, by mutual mistake of law; and, in such case, no action will lie to recover back the money. The construction of the law is open to both parties, and each presumed to know it. Any instructions from the treasury department could not change the law, or affect the rights of the plaintiff. He was not bound to take, and adopt that construction. He was at liberty to judge for himself, and act accordingly. These instructions from the treasury seem to be thrown into the question for the purpose of showing, beyond all doubt, that the collector acted in good faith. To make the collector answerable, after he had paid over the money, without any intimation having been given that the duty was not legally charged, cannot be sustained

upon any sound principles of policy or of law. There can be no hardship in requiring the party to give notice to the collector that he considers the duty claimed illegal, and put him on his guard, by requiring him not to pay over the money. The col·lector would then be placed in a situation to claim an indemnity from the government. But if the party is entirely silent, and no intimation of an intention to seek a repayment of the money; there can be no ground upon which the collector can retain the money, or call upon the government to indemnify him against a suit. It is no sufficient answer to this that the party cannot sue the United States. The case put in the question, is one where no suit would lie at all. It is the case of a voluntary payment under a mistake of law, and the money paid over into the treasury: and if any redress is to be had, it must be by application to the favor of the government, and not on the ground of a legal right.

The case of Morgan v. Palmer, 2 Barn. and Cres. 729, was an action for money had and received, to recover back money paid for a certain license; and one objection to sustaining the action was, that it was a *voluntary* payment. The court did not consider it a voluntary payment, and sustained the action: but Chief Justice Abbot, and the whole court, admitted that the objection would have been fatal, if well-founded in point of fact. The court said it had-been well argued, that the payment having been voluntary, it could not be recovered back in an action for money had and received. And in Brisbain v. Dacres, 5 Taunt. 154, the question is very fully examined by Gibbs, justice, and most of the cases noticed and commented upon, and with the concurrence of the whole court, except Chambre, justice, lays down the doctrine broadly, that where a man demands money of another, as matter of right, and that other, with a full knowledge of the facts upon which the demand is founded, has paid a sum of money voluntarily, he cannot recover it back. It may be, says the judge, that, upon a further view, he may form a different opinion of the law; and it may be, his subsequent opinion may be the correct one. If we were to hold otherwise, many inconveniences may arise. There are many doubtful questions of law. When they arise, the defendant has an option, either to litigate the question, or submit to the demand and pay the money. But

[Elliott v. Swartwout.]

it would be most mischievous and unjust, if he, who has acqui-
esced in the right by such voluntary payment, should be at lib-
erty, at any time within the statute of limitations, to rip up the
matter, and recover back the money. This doctrine is peculiarly
applicable to a case where the money has been paid over to the
public treasury, as in the question now under consideration.
Lord Eldon, in the case of Bromley v. Holland, 7 Vesey 23,
approves the doctrine, and says it is a sound principle, that a
voluntary payment is not recoverable back. In Cox v. Prentice,
3 Maul and Selw. 348, Lord Ellenborough says; I take it to be
clear, that an agent who receives money for his principal, is
liable, as a principal, so long as he stands in his original situation,
and until there has been a change of circumstances, by his having
paid over the money to his principal, or done something equiv-
alent to it. And in Buller v. Harrison, 2 Cowp. 568, lord Mans-
field says, the law is clear, that if an agent pay over money,
which has been paid to him by mistake, he does no wrong, and
the plaintiff must call on the principal; that if, after the payment
has been made, and before the money has been paid over, the
mistake is corrected, the agent cannot afterwards pay it over
without making himself personally liable. Here, then, is the
true distinction : when the money is paid voluntarily, and by mis-
take, to an agent, and he has paid it over to his principal, he
cannot be made personally responsible : but if, before paying it
over, he is apprized of the mistake, and required not to pay it
over, he is personally liable. The principle laid down by Lord
Ellenborough, in Townsend v. Wilson, 1 Campbell 396, cited
and relied upon on the part of the plaintiff, does not apply to this
case. He says, if a person gets money into his hands illegally,
he cannot discharge himself by paying it over to another : but
the payment, in that case, was not voluntary : for, says Lord
Ellenborough, the plaintiff had been arrested, and was under
duress when he paid the money. In Stevenson v. Mortimer,
2 Cowp. 816, Lord Mansfield lays down the general principle,
that if money is paid to a known agent, and an action is brought
against the agent for the money, it is an answer to such action
that he has paid it over to his principal. That he intended, how-
ever, to apply this rule to cases of voluntary payments made by

mistake, is evident from what fell from him in Sadler v. Evans, 4 Bur. 1987. He there said, he kept clear of all payments to third persons, but where it is to a known agent; in which case the action ought to be brought against the principal, unless in special cases, as under *notice*, or mala fides: which seems to be an admission that, if notice is given to the agent before the money is paid over, such payment will not exonerate the agent. And this is a sound distinction, and applies to the two questions put in the second and third points in the case now before the court. In the former, the payment over is supposed to be without notice; and in the latter after notice, and a request not to pay over the money. The answer, then, to the second question is, that under the facts there stated, the collector is not personally liable.

3. The case put by the third point, is where, at the time of payment, notice is given to the collector that the duties are charged too high, and that the party paying, so paid to get possession of his goods; and accompanied by a declaration to the collector, that he intended to sue him to recover back the amount erroneously paid, and notice given to him not to pay it over to the treasury.

This question must be answered in the affirmative; unless the broad proposition can be maintained, that no action will lie against a collector to recover back an excess of duties paid him; but that recourse must be had to the government for redress. Such a principle would be carrying an exemption to a public officer beyond any protection, sanctioned by any principles of law or sound public policy. The case of Irving v. Wilson and another, (4 Term Rep. 485,) was an action for money had and received, against custom-house officers, to recover back money paid to obtain the release and discharge of goods seized, that were not liable to seizure: and the action was sustained. Lord Kenyon observed, that the revenue laws ought not to be made the means of oppressing the subject; that the seizure was illegal; that the defendants took the money under circumstances which could by no possibility justify them; and, therefore, this could not be called a voluntary payment.

The case of Greenway v. Hurd, (4 Term 554,) was an action against an excise officer, to recover back duties illegally receiv-

[Elliott v. Swartwout.]

ed ; and Lord Kenyon does say, that an action for money had and received will not lie against a known agent, but the party must resort to the superior.    But this was evidently considered a case of voluntary payment.    The plaintiff had once refused to pay, but afterwards paid the money ; and this circumstance is expressly referred to by Buller, justice, as fixing the character of the payment.    He says, though the plaintiff had once objected to pay the money, he seemed afterwards to waive the objection by paying it.    And Lord Kenyon considered the case as falling within the principle of Sadler v. Evans, 4 Bur. 1984, which has already been noticed.    In the case of Snowden v. Davis, 1 Taunt. 358, it was decided that an action for money had and received, would lie against a bailiff, to recover back money paid through compulsion, under color of process, by an excess of authority, although the money had been paid over.    The court say, the money was paid to the plaintiff, under the threat of a distress ; and although paid over to the sheriff, and by him into the exchequer, the action well lies ; the plaintiff paid it under terror of process to redeem his goods, and not with intent, that it should be paid over to any one.    The case of Ripley v. Gelston, 9 John. 201, was a suit against a collector to recover back a sum of money demanded by him for the clearance of a vessel.    The plaintiff objected to the payment, as being illegal, but paid it for the purpose of obtaining the clearance, and the money had been paid by the collector into the branch bank to the credit of the treasurer.    The defence was put on the ground that the money had been paid over, but this was held insufficient.    The money, say the court, was demanded as a condition of the clearance ; and that being established, the plaintiff is entitled to recover it back, without showing any notice not to pay it over.    The cases which exempt an agent do not apply.    The money was paid by compulsion.    It was extorted as a condition of giving a clearance, and not with intent or purpose to be paid over.    In the case of Clinton v. Strong, 9 John. 369, the action was to recover back certain costs, which the marshal had demanded on delivering up a vessel which had been seized, which costs the court considered illegal ; and one of the questions was whether the payment was voluntary.    The court said the payment, could

not be voluntary. The costs were exacted by the officer, colore officii, as a condition of the redelivery of the property ; and that it would lead to the greatest abuse to hold that a payment under such circumstances, was a voluntary payment precluding the party from contesting it afterwards. The case of Hearsey v. Pryn, 7 John. 179, was an action to recover back toll which had been illegally demanded ; and Spencer, justice, in delivering the opinion of the court, says the law is well settled, that an action may be sustained against an agent who has received money, to which the principal had no right, if the agent has had notice not to pay it over. And in the case of Fry v. Lockwood, 4 Cowen 456, the court adopts the principle, that when money is paid to an agent for the purpose of being paid over to his principal, and is actually paid over, no suit will lie against the agent to recover it back. But the distinction taken in the case of Ripley v. Gelston, is recognised and adopted ; that the cases which exempt an agent when the money is paid over to his principal without notice, do not apply to cases where the money is paid by compulsion, or extorted as a condition, &c. From this view of the cases, it may be assumed as the settled doctrine of the law, that where money is illegally demanded and received by an agent, he cannot exonerate himself from personal responsibility by paying it over to his principal; if he has had notice not to pay it over. The answer, therefore, to the third point must be, that the collector is personally liable to an action to recover back an excess of duties paid to him as collector, under the circumstances stated in the point; although he may have paid over the money into the treasury.


This cause came on to be heard on the transcript of the record from the circuit court of the United States, for the southern district of New York, and on the questions on which the judges of the said circuit court were opposed in opinion, and which were certified to this Court for its opinion, agreeably to the act of congress in such case made and provided, and was argued by counsel ; on consideration whereof, it is the opinion of this Court, on the first question, that the said shawls and suspenders were

[Elliott v. Swartwout.]

not a manufacture of wool, or of which which wool was a component part, within the meaning of the words "all other manufactures of wool, or of which wool is a component part," in the second article of the second section of the act of congress of 14th July, 1832.

On the second question, it is the opinion of this Court, that, under the facts as stated in the said second question, the collector is not personally liable.

On the third question, it is the opinion of this Court, that the collector, under the circumstances as stated in the said question, is liable to an action to recover back an excess of duties paid to him as collector, although he may have paid over the money into the treasury. Whereupon, it is ordered and adjudged by this Court, to be so certified to the said circuit court of the United States for the southern district of New York.