Ranney, J.
Two questions arise upon the bill of exceptions taken upon the trial of this cause in the superior court: First, Had the city council of Cincinnati power, under their charter, to enact and enforce the 24th and 25th sections of an ordinance “ To regulate hucksters and to prevent forestalling,” passed Sept. 18, 1843, and amended May 23, 1845 ; and, second, May the money paid by the plaintiff, to obtain his licenses, if these sections are illegal, be recovered back in an action for money had and received. "We will consider these questions in the order thus stated.
I. By the 24th section, a huckster is thus defined: “Any person, not a farmer or butcher, who shall sell, or offer to sell, in market, any meats, vegetables, provisions, groceries, wares, or other commodities whatsoever, not of his own produce or manufacture, shall be deemed a huckster.”
*The other sections referred to provide, in substance, that the city council may, on petition, setting forth the kind of articles to be dealt in, grant licenses to hucksters for one year, for such sum as they may see proper, which license shall specify the kind of articles to be dealt in as described in the petition ; and the amendatory ordinance further provides that “ Every person who shall be guilty of huckstering, without license, shall, on conviction thereof, pay a fine not exceeding thirty dollars for each offense ; and any licensed huckster who shall be convicted of forestalling, shall forfeit his or her license.”
In pursuance of these ordinances, the plaintiff, at different times, petitioned the city council, and obtained four several licenses, extending from 1845 to 1848, to sell in the marxets of the city, butter, eggs, poultry, fruit, etc., and for which he paid, in the aggregate, the sum of |95, and one dollar to the mayor for issuing each license, which was shown to be a reasonable compensation for the service. To sustain these ordinances, the counsel for the city relies
*233 upon the following clause, in the 9th section of the city charter, passed March 1, 1834: “ They [the council] shall erect, establish, ,and regulate the markets and market-places of said city, for the sale of provisions, vegetables, and other articles necessary for the •sustenance, comfort, and convenience of said city and the inhabitants thereof.” This provision of the charter came under review ■at the December term of the court in bank, in the year 1840, in the •case of The City of Cincinnati v. Buckingham, 10 Ohio, 257, and it was there held that an ordinance collecting twenty-five cents from persons occupying, with a wagon or other vehicle, stands in the market-place during market hours, was lawful, and might be enforced by fine and judgment before the mayor. This decision proceeded upon the ground that the suin exacted was not a tax, but “ rather a price demanded for accommodations provided for the frequenters of the market by the city authorities.”
*With a view of limiting this power of the city, affirmed to exr ist by this decision, the legislature, then in session, passed the supplementary and explanatory act of February 19, 1840 ; by which it is in substance provided that the charter shall not be so construed as to empower the city council to pass an ordinance to levy any tax, toll, assessment, or other charge upon any wagon or other vehicle, or the animals belonging thereto, bringing produce or provisions to the market, or for occupying a place with the same in marketplaces on market days, or the evenings previous thereto. This act then contains the following proviso: “ That nothing in this act contained shall prohibit the city council from passing all ordinances necessary and proper to prevent forestalling the markets and huckstering therein.”
It is insisted by the plaintiff, that the sections of the ordinances now under consideration, are in conflict with this act; and further, that the sum demanded for a license to pursue the business, and to avoid the penalties, is substantially a tax upon the particular employment, and involves the exercise of a power not conferred upon the city by its charter.
We are of opinion that these positions are well taken, and that, for either reason, these provisions of the ordinances are unauthorized and void.
1. The act of 1840, like every other law, must be construed by the language employed. Where there is no ambiguity in that, no •construction at variance with the plain and obvious import of the *234 words is allowed. That act in positive terms extends the benefit of its provisions to every person bringing produce or provisions to-the market in the manner specified in it. It can not be limited without adding to the enactment, which neither the city council nor the court can be permitted to do. The city council have, however, undertaken it. While the law exempts every person bringing provisions to the market as above, from any charge whatever, without any regard to the fact whether it is his own produce or manufacture, the ordinance imposes a fine upon every *person, not. a farmer or butcher, who sells or offers for sale any article not of bis own produce or manufacture. No matter whether in large or small quantity, or whether brought upon wagons with horses attached or in the less imposing way of a .hand-cart or wheel-barrow. And this is done by defining all such persons, not being farmers or butchers, as hucksters ; and we are told that the council have-a right to determine who shall be deemed such. If this is so, and the council have a right to include large classes of persons not falling within the ordinary signification of the word, no reason can be given why they may not also include farmers and butchers, and in-that way repeal the law altogether. It is conceded that the word,, without being thus improved upon, signifies a petty dealer—a retailer of small articles of provisions, nuts, etc. Webster informs-us that “ it seems to be from hoeken, to take on the back, and to signify primarily a pedlar, one that carries goods on his back.” Without entering into very nice distinctions, for which we acknowledge-our want of qualifications, we feel no hesitation in saying that the legislature must be presumed to have intended what the common and ordinary import of the language used would indicate; and that it was no part of the franchises of municipal corporations to-change the meaning of English words.
Undoubtedly the council may, if they see'proper, prevent huckstering in its true and proper sense, in the markets. That power,, if not given, is expressly recognized by the act of 1840 ; and to this end they may employ any appropriate and necessary means. But-they can not, under this pretence, exercise another great substantive power, like that of taxation not conferred by the charter. To hold otherwise would be to allow a single granted power to draw to it all others, however remotely connected. But the council have not undertaken to prevent huckstering. When they do so, it will be time-to consider the extent and nature of this power.
*235 2. The case is equally clear upon the other ground stated. It is unnecessary to consider whether the state had power to *levy taxes upon any particular employment or business. It is sufficient for present purposes that, with the exceptions contained in the 11th section of the charter, no such power has been conferred upon the city of Cincinnati. The power is expressly conferred to levy taxes to defray the current expenses of the city upon the real and personal property therein, as it appears upon the grand levy of the state. The city is thus clothed with ample power, by this mode of taxation, to raise money to accomplish all its lawful purposes. ' On any principle this necessarily excludes all other modes of taxation, as any other becomes unnecessary to carry into effect its granted powers. But we have no hesitation in placing it upon higher ground. The power to tax is one of the highest attributes of sovereignty. It involves the right to take the private property of the citizen without his consent, and without other compensation than the promotion of the public good. Such interference with the natural right of acquisition and enjoyment gaurantied by the constitution, can only be justified when public necessity clearly demands it. Being a sovereign power, it can only be exercised by the general assembly, when delegated by the people in the fundamental law; much less can it be exercised by a municipal corporation without a further unequivocal delegation by the legislative body. None such is found here, and the only remaining question is, Was the sum demanded by the ordinance for the license to trade, a tax? The sum required is limited only by the discretion of the council; but whatever it may be, it goes into the city treasury and constitutes a part of its general fund. The term has been correctly defined to be one of general import, including almost every species of imposition on persons or property for supplying the public treasury, as tolls, tribute, subsidy, excise, impost or customs. In a more limited sense it is the sum laid for the same purpose upon polls, lands, houses, personal property, professions and occupations. Whether regarded in the larger or more limited sense, the sum .here exacted is clearly included. A license may include a tax or it may not. If the exaction *goes no further than to cover the necessary expenses of issuing it, it does not; but if it is made a means of supplying money for the public treasury, we agree with the court in State v. Roberts, 11 Gill & Johns. 506, that it “is a tax, is too palpable for discussion.”
*236 Nor do these views necessarily conflict with the case of the City of Cincinnati v. Bryson, 15 Ohio, 625. That case arose upon an ordinance requiring draymen, etc., to obtain a ■ license, for which they were charged three dollars. The council had express power, by the charter, to license and regulate draymen. It was agreed by the whole court that this conferred no taxing power; but a .majority of the court thought it was not sufficiently shown that the sum demanded exceeded the necessary expenses incident to the issuing of the license. The doctrine of the case is,' so far, not incorrect, whether a correct application of it was made or not.
II. These ordinances being illegal and void, our remaining inquiry is, Can the plaintiff recover the money he paid to obtain the licenses in this action for money had and received ? The bill of exceptions shows that the licenses were issued upon his own petition, and that the money was paid without protest or any notice whatever that he intended to recover it back. Under these circumstances it is claimed by the city that the payment was voluntary, and no implied promise arises to refund it. This claim is resisted by the plaintiff,, and it is insisted that the payment might well be made to avoid prosecution for the penalties, and prevent interruption to his business; and such payment would not be considered voluntary ; and one of his counsel says he “ makes the assertion without fear of successful contradiction, that in all the authorities extant, not one can be adduced to contradict the plaintiff’s right to recover.” In this conflict of opinion between counsel, we must be guided by the law as we find it, in the settlement of this question : Was the payment,in the legal sense,’voluntary or involuntary? In the case of Fulham v. Down, 6 Esp. 26, Lord Kenyon is reported to have said : “ A voluntary payment of an illegal *demand, the party knowing the demand to be illegal, without an immediate and urgent necéssity (unless to redeem or preserve his person or goods) is not the subject of an action for money had and received.”
The case of Brisbane v. Dacres, 5 Taunt. 143, was an action brought to recover back the amount of certain freights for the transportation of specie, received by the defendant illegally, as commander of a government vessel. The court refused to allow a recovery, and laid down the principle broadly, that if a person, with knowledge of the facts, but under a mistake as to the law, pays over to another, claiming it as a right, money which he was not compelled to pay, he can not, upon discovering what his legal right *237 was, recover it back, there being nothing against conscience in the other party’s retaining it. Gibbs, J., says: “ If we were to hold otherwise, I think many inconveniences may arise; there are many doubtful questions of law; when they arise, the defendant has his option either to litigate the question or to submit to the demand and pay the money. I think that by submitting to the demand, he that pays the money gives it to the person to whom he pays it, and makes it his, and closes the transaction between them. He who receives it has a right to consider it as his without dispute; he spends it in confidence that it is his; and it would be most mischievous and unjust, if he who has acquiesced in the right, by such voluntary payment, should be at liberty, at any time within the statute of limitation, to rip up the matter and recover back the money.” And Lord Mansfield remarked, that the maxim volunti non fit injuria, applied most strongly to the case.
The case of Wilson v. Ray, 10 Ad. & El. 82, was brought to recover the amount paid upon bills given by the plaintiff, an insolvent, to obtain the signature of the defendant to a composition deed. The court held that he could not recover; for the transaction had been closed by a voluntary payment, with a full knowledge of the facts, and ought not to be reopened; and that it made no difference that the sum in question had not been recovered by action. Lord Denman, O. J., *said: “ This plaintiff might have then refused payment; and if the defendant had brought his action, he had the opportunity of defending himself by the illegal nature of the consideration. He waived the advantage, and voluntarily paid the bills with a full knowledge of all the facts; and it is not now open to him to deny that he was liable on them.” In the case of Atlee v. Backhouse, 3 Mees. & Wels. 644, Lord Abinger, C. B., states the result of all the English cases to be, that in all cases where goods of the party have been wrongfully seized or detained for the purpose of exacting money, he is entitled, after payment of the money, to bring an action for money had and 'received, to try the right. And in the very recent case of Oates v. Hudson, 5 Law & Eq. 470, the rule, as laid down in Atlee v. Backhouse, was approved by the whole court.
The case of Elliot v. Swartwout, 10 Pet. 150, was brought to recover back of the defendant money illegally received by him as collector of duties at the port of New York. The -supreme .court of the United States held, unanimously, that the action would not *238 lie. Mr. Justice Thompson, in delivering the opinion, said that it presented “the case of a purely voluntary payment, without objection or notice not to pay over the money, or any declaration made to the collector of an intention to prosecute him to recover back the money. It is, therefore, to be considered as a voluntary payment, by mutual mistake of law; and in such case, no action will lie to recover back the money. The construction of the law is open to both parties, and each presumed to know it.” And he adds: “ It is no sufficient answer to this that the party can not sue the United States. The case put in the question is one where no suit will lie at all.”
The doctrine of the supreme court of Massachusetts upon this subject is very clearly stated in the recent case of the Boston and Sandwich Glass Co. v. The City of Boston, 4 Met. 181. The action was brought to recover the amount of a tax illegally assessed and collected under protest, and a recovery was had upon the ground that the collector had a right to *seize property in the first instance without resorting to an action. The court, after laying down the general rule to be, “that if a party/with a full knowledge of all the facts of the case, voluntarily pays money in satisfaction or discharge of a demand unjustly made on him, he can not after-wards allege such payment to have been made by compulsion, and recover back the money, even though he should protest, at the time of such payment, that he was not legally bound to pay the same,” proceed to say: “ The reason of the rule and its propriety are quite obvious, when applied to a case of payment upon a mere demand of money, unaccompanied with any power or authority to enforce such demand, except by a suit at law. In such case, if the party would resist an unjust demand, he must do so at the threshold.. The parties treat with each other on equal terms; and if litigation is intended by the party of whom the money is demanded, it should precede payment.”
The decisions in New York are to the same purpose. In the case of Clark v. Dutcher, 9 Cow. 674, it was held, after an elaborate review of the English cases, that where money is paid with a full knowledge of the facts and circumstances upon which it is demanded, or with the means of such knowledge, it can not be recovered back upon the ground that the party supposed he was bound in law to pay it when in fact he was not. He will not be permitted to allege his ignorance of the law, but it will be consid *239 «red a voluntary payment. The same doctrine is reiterated in Silliman v. Wing, 7 Hill, 159, and Abell v. Douglas, 4 Denio, 308. In perfect accordance with those cases, and very much in point in this, is the case of Fleetwood v. The City of New York, 2 Sand. S. C. 475, in which it was held that the payment of an illegal demand without any legal compulsion or duress of goods could not be recovered hack, although protested against at the time.
And in Maryland, in the cases of Mayor of Baltimore v. Lefferman, 4 Gill, 425, and Morris v. The Mayor of Baltimore, 5 Gill, 244, the court of appeals held that a payment could not be ^regarded as compulsory, so as to entitle the payer to recover back the amount, unless to emancipate his person or property from an actual and existing duress imposed by the party to whom such payment is made.
The case of Robinson v. The City of Charleston, 4 Rich. 317, decided by the court of appeals of South Carolina in 1846, is precisely in point in this. There the city council passed an illegal ordinance, imposing a higher price on non-residents for badges for laborers than upon residents. The plaintiff, a non-resident, paid it for several years, and then sued to recover back the money. The court held he could not, and say, “ he either paid it with a knowledge of the law on the subject, or he did not. In either point of view the payment was voluntary.”
I shall refer to but one -other authority—the case of Smith v. The Inhabitants of Readfield, 27 Maine, 145, decided by the supreme court of Maine in 1847. A tax was illegally assessed upon the plaintiff, which he paid without coercion, and sued to recover it back. The court held that it was paid voluntarily; that the fact that the taxes were paid to collectors, who had warrants for the collection, afforded no satisfactory proof of payment by duress; and they add : “ To constitute payment by duress in such a case, there should be proof of an arrest of the body, or of a seizure of the property, or proof authorizing the conclusion that such an arrest or seizure could be avoided only by payment.”
This unbroken chain of authority seems to warrant the conclusion, that a payment of money upon an illegal or unjust demand, when the party is advised of all the facts, can only be considered involuntary when it is made to procure the release of the person or property of the party from detention, or when the other party is armed with apparent authority to seize upon either, and the *240 payment is made to prevent it. But where he can only be reached by a proceeding at law, he is bound to make his defense in the-first instance; .and he can not postpone the litigation by paying the demand in silence, and afterward suing to recover it back. We *have carefully examined the cases cited by the plaintiff’s-counsel, and can find nothing in any of them that militates against these conclusions. We will not say that no case can be found that would warrant the plaintiff’s recovery; but we can say that, if any such exists, we have been unable to find it. The justice of the case, no less than the law, is against him. He has enjoyed the monopoly which these illegal ordinances were calculated to afford, and it is fair to presume, as in all such cases, that he has got back, the money paid for his licenses from his customers in the increased price of his commodities. To tax these same customers to pay it to him, and others similarly circumstanced, again, would not be-right if it was law; but most clearly it is neither. The judgment of the superior court is affirmed.

Judgment affirmed.