Mr. Justice STORY.
I regret exceedingly being compelled by a sense of duty to express openly my dissent from the opinion of the majority of the court in this case. On ordinary occasions my habit is to submit in ■silence to the judgment of the court where I happen to entertain an opinion different from that of my brethren. But .the; present case .involves,, in my judgment, doctrines-and consequences which, with the utmost deference and. respect for those who think otherwise, I cannot' but deem most deeply affecting the rights of all our citizens,' and calculated to supersede the great guards of those rights intended to be secured by the Constitution through the instrumentality of the *253 judicial, power, state or national. The question, stripped of all formalities, is neither more' nor less than thisWhether Congress have a right to take from the citizens all right of action in any court,to recover back money claimed illegally, and extorted by compulsion, by. its officers under colour Of law, but without any legal authority, and thus to deny them all remedy for an admitted wrong, and to clothe the -secretary of the Treasury with .the. sole and exclusive authority to withhold or restore that money according to his own notions of justice or right ? If Congress may do so in the present case, in the exercise of its power to levy and collect taxes and duties, and. thus take away from all courts,'state and national, all right to interprfet-the laws for levying and collecting taxes and duties, mid to confide such interpretation to one of its own executive functionaries, whose judgment is to be at once .summary and final, then I must say, that it seems to me to be not what I had hitherto.supposed it to be: a government where the three great departments, legislative, executive, and judicial, had independent duties to perform each in its own sphere; but the judicial power, designed by the Con-' stitution to be the final and appellate .jurisdiction to interpret our laws, is superseded in its most vital and important ftmctions. I. know of; no power, indeed, of which a free people ought to be more jealous, than of that of levying taxes and duties; and yet if it is to rest with a mere executive functionary of the government absolutely' and finally to .decide what taxes and duties are leviable under a particular act,,without any power of appeal to any judicial tribunal, it seems to me that we have no'security whatsoever for the rights of the citizens. And if Congress possess a constitutional’authority to vest such summary and final power of interpretation in an executive functionary, I know no other subject within the reach of legislation which may not be exclusively confided in the same way to ah executive fimctionarynay, to the executive himself. Cam it be true that the American people ever contemplated such á state of things as- justifiable or practicable under our Constitution P I cannot bring my mind to believe it; and, therefore, I repeat it, with the most sincere respect for my brethren, who entertain a different opinion, I deny thé constitutional authority .of Congress to delegate such functions to any executive officer, orto take away all,right of action for an admitted-wrong and illegal exercise of power in the levy of money from the injured citizens.. .1 am further of opinion, as I shall endeavour presently to show, that Congress never had contemplated passing any such act, and that the act of the 3d of March, 1839, chap. 82, § 2, neither requires nor in my humble judgment justifies such an interpretation.
What is the real question presented, upon the division of opinion in the Circuit-Court, for the consideration of this court? It is not whether an action to recover back the money illegally claimed and paid to tiie collector for duties, in order to obtain possession of the *254 goods by the owner under a protest that they were not legally due, would lie in the Circut Court, for no such question arises on the record, and it is incontrovertible and uncontroverted, that if any such action would lie,' it would lie in the national courts as well as in the state courts. It is not whether Congress may limit, restrain, modify, or eveq take away the right to sue in the national courts, in cases like the present, or, indeed, in any other class of cases not constitutionally provided for,' but it is simply whether the act of Congress of the 3d of March, 1839, chap. 82, § 2, is a bar to such an action in any court, state or national. If it is a good bar in one court, it is good in all courts under the provisions of that act. If Congress have a right to say, and have said, under the provisions of that act, that no officers of the customs shall be liable to any action for money extorted by him under colour of his office without authority and against law, then these provisions are equally applicable to all courts, and furnish the rule of decision; for all. And Congress have an equal right to apply a like provision to all other acts of all other officers done under colour of office, and the trial by jury may, in suits at common law, be completely taken away in all such cases, and the right of finabdecision be exclusively vested in the executive, or in any other public functionary, at the pleasure of Congress.
" Now, how stands the common law on this very subject? It is, that an action for money had and received lies in all cases to recover back money which a person pays to another in order to obtain possession of his goods frojn the latter, who withholds them from him upon an illegal demand, or claim, colore officii, and thus wrongfully receives and withholds the money. Such a payment is in no just sense, treated in law as a voluntary payment, but it is treated as a payment made by compulsion, and extorted by the necessities of the party who phys it. ' Such is the doctrine of the common law as held' in England, with a firm and steady handj against all the claims of prerogative, and it is maintained in our day as the undeniable, right of every Englishman, against the unjust and illegal ex-actions of officers of the crown. Mr. Justice Bayley laid down the general principle with great exactness in Shaw v. Woodcock, 7 Barn. and Cres. 73, 84, and said: “ If a party has in his possession goods or other property belonging to another, and refuses to deliver such property to that other unless the latter pays him a sum of money which he has no right to receive,- and the latter, in order to obtain possession of his property, pays that sum, the money so paid is a . payment made by compulsion, and may be recovered back.” In Irving v. Wilson, 4 Term R. 485, the doctrine was applied to the very case of the acts of an officer of the excise or customs. Upon that occasion Lord Kenyon emphatically said: “The revenue laws ought not to be made the means of oppressing the subject. If goods liable to a forfeiture be forfeited, the officer is to seize them for the king, but he is not permitted to abuse the duties of his sta *255 tion, and to make it a mode of extortion.” There- are many other authorities leading to the same result, but it is unnecessary to cite them, since the very point that an action for money had and received lies against a collector of the customs to recover back money demanded by and paid to him, colore officii, upon goods imported, for duties not legally due thereon, has been, upon the most solemn deliberation, held by .this court in the cases of Elliott v. Swartwout, 10 Peters, 137, and Bend v. Hoyt, 13 Peters, 263, 267.
It is an entire mistake -of the true meaning of the rule of the com-, mon law, which is sometimes suggested in argument, that the action of assumpsit for money had and received is founded upon a voluntary, express, or implied promise, of the defendant, or that it requires privity between the parties ex contractu to support it. The rule of the common law has a much broader and deeper foundation. Wherever the law pronounces that a party is. -under a legal liability or duty to pay over money belonging to another, which he. has no lawful right to exact or retain from him, there it forces the' promise upon him in invitum to pay over the money to the party éntitled to it. . It is a result of the potency of the law, and is in no shape dependent upon the will or consent or voluntary promise of the wrongful possessor. ’ The promise is only the form in which the law announces its own judgment upon the matter of right and duty and remedy; and under such circumstances any argument founded upon the form of the action, that it must- arise under or in virtue of some contract, is disregarded, upon the maxim qui hceret in litera, hceret in cortice. Hence, it is a doctrine of tire common law, (as - far as my researches extend,) absolutely universal, that if a man, by fraud, or wrong,, or illegality, obtains, or exacts, or retains money justly belonging to another, with notice that the latter contests .the right of the former to receive, or exact, or retain it,' an action for money had and received lies' to recover it back; and it is no answer for the wrongdoer to say that he has paid it over to his superior; for although as between the wrongdoer and his superior, the maxim may well apply, respondeat'superior, yet the injured party is not bound to seek redress in that directionand a fortiori, &c., he is not so bound, where, as in the case of the government, the superior is not suable. That would be amere mockery of justice. And this is the-very doctrine affirmed in its full extent by this court in the cases of Elliott v. Swartwout, 10 Peters, 137, and Bend v. Hoyt, 13 Peters, 263, 267.
An- action for money, had and received being then the known and appropriate- remedy of the common' law, applied to cases of this sort, 'to protect the subject from illegal taxation, and duties levied- by public officers, what -ground is there to suppose that Congress could intend to take away so important and valuable a remedy, and leave our citizens utterly without any adequate protection ? It is said, that circuitously another remedy may be founvL. The answer is, that if *256 Congress have taken away the direct remedy, the circuitous remedy must be equally. barred. But in point of fact no other judicial remedy does exist or can be applied. If the collector is not responsible to pay back the money, nobody is. The government itself is not suable- at all; arid certainly there is np pretence to say that the secretary of the Treasury is suable therefor. Where then is the remedy which is Supposed to exist ? It is an appeal to the secretary of the Treasury for a- return of,the money, if, in his opinion it ought to be returned,' and not otherwise. . No court, no jury, nay, not even .the ordinary rules of evidence, are to pass between that' officer and the injured claimant, to try his rights or to- secure.him adequate redress, Assuming that the secretary of the Treasury will always be disposed to do what he deems to be right in the exercise of his discretion, and that'he possesses all the qualifications requisite, tq perform this duty, among the other complicated duties of his office — a presumption which I am in no manner disposed to question — still it removes not a single objection. It is, after all, a substitution of executive authority and discretion for judicial remedies. Nor should it be disguised, that upon so complicated a subject as the nature and character of articles made-subject to-duties, grave controversies must always exist (as they have always hitherto existed) as to the category within which particular fabrics and articles are. to be classed. The line of discrimination between, fabrics and articles approaching near to each other in quality, or component materials, or commercial denominations, is often very.'nice and difficult, and sometimes exceedingly obscure, It' is the very case, therefore, which, is’ fit for judicial inquiry and decision, and falls within the reach of that branch of the judicial power given by the Constitution, where it is declared “ that the judicial power shall extend to all cases in Iqw and equity arising' under this Constitution., the laws of the United States, and treaties, &c.” ' If then thé judicial power-is to. extend to all cases arising under the.laws of the United States, upon what ground are we to say that cases of this sort, which are eminently “ cases arising under the laws,” and of a judicial nature, are to be excluded from judicial cognisance, and Iodgéd with an executive functionary?
Besides, we all know that, in all revenue-eases, it is the constant practicé of the secretary of the Treasury to give written .instructions to the various collectors of the customs as to what dirties are< to be collected under particular revenue laws, and what, in his judgment, is the proper interpretation of those laws. I will venture to assert that,, in nineteen -cases out of .twenty of doubtful interpretation of. any such laws, the collector never acts without the express instructions .of the secretary of the Treasury. So that in most, if not in all cases where a controversy arises, the secretary, of the Treasury, has already pronounced his own judgment. Of what use then, practically speaking, is the appeal to him, since he has already given his decision ? Further, it is well known, and the annals of *257 this court as well as those of the other courts of the United States establish in the fullest manner, that the interpretations so given by the secretary of the Treasury have, in many instances, differed widely- from those of the courts. The Constitution looks to the courts as the final interpreters of the laws. Yet the-opinion maintained by my brethren does, in effect, vest such interpretation exclusively in that officer.
These considerations have led me to the ¡conclusion that it never could be the intention of Congress to pass any statute, by which the courts of the United States, as well as the state courts, should be excluded from all judicial power in the interpretation of the revenue laws, and that it should be exclusively confided to an executive functionary finally to interpret and execute them — -a'power which must press severely, upon the citizens, however discreetly exercised, and which deeply ‘involves their- constitutional rights, privileges, and liberties. The same considerations force me, in all cases- of doubtful pr ambiguous language admitting of different interpretations; -to cling to that which should least trench upon those rights, privileges, and liberties, and & fortiori to adopt that which would be in general harmony with our whole system of government.
And this leads me to say that, after the most careful examination of the-2d section of the act of 1839, chap. 82,1 have not'been able-to find any ground to presume that Congress evér contemplated any ” thing contained in that section to be a bar to the present action. I look -upon that section as framed for a very different object, an object founded injsound policy and to secure the public intérest.' It was to prevent officers of the customs from retaining (as the habit of some had been) large sums of money in their hands received for duties, upon the pretence that they had been paid under protest, and thus to secure in the hands of the officers a sufficient indemnity for all present as well as future liabilities to the persons who had paid them. By this means large sums of money were withheld from the government, and there was imminent danger that severe losses might thus be sustained from the defalcation of those officers, and the public revenue might -be thus appropriated to the personal business or ’ speculating concerns of the officers. ' If actions should be brought and judgment obtained, against such officers for the repayment of any of Such duties, it was plain that the government would be bound to indemnify them, especially if they had acted under instructions from the-Treasury Department. On the other hand, the government,' being in possession of the5'money, would hold it in the mean time as a deposit to await events, and to refund the same -if in the due administration of the law it was adjudged that it ought to be refunded. ' Such, in my judgment, was the object and the sole object of the section, and it seems to me in this view to be founded in a wise protective policy.
*258 ■With this exposition in our view; let us examine the language of the section. • It is as follows: “ That from and- after the passage of this act, all money paid to any-collector of the customs or .to any person acting as such, for unascertained duties or for duties paid under protest against the rate or amount of duties charged, shaft be placed to the credit of'the treasurer of the United States, kept and disposed of as all other money paid for duties is required by law .or by regulation of the Treasury Department to be placed to the credit of said treasurer, kept and disposed of; and shall not be held by the said collector or person acting as such to await.any ascertainment of duty, or- the result of any-'litigation .in. relation to the rate or -amount-of duty legally chargeable and collectable in any case , where money is so paid.” Now, pausing here, it seems to me that the clause is plainly and merely, directory to the- collector or person acting as such, pointing out his duty and requiring him to pass- the money so paid to the. credit of the government, as soon as it is received.' Nothing is here said as to the rights .of third persons, who pay the money for duties; no declaration is made-that the collector shall not be liable to any action for such duties,, if not legally '•demaridable or payable, or that the-' collector or such other person shall hot be liable to refund the same. - And yet, if such had been the intention of Congress, it seems to me incredible that a provision to this effect should not have been found, in the act. But further; not only is there a total absence of any such provision, but there is positive evidence that Congress, contemplated that there would be suits brought against the collectors arid,other persons for the .repayment of" such duties, and, accordingly,-as we see, the money is not to be retained by them “to await any ascertainment of duties or the result of any litigation.” The .language is not limited tó the result of . past or pending litigation, but it equally applies .to future litigation; in short, any litigation; without any limitation as to time, and indeed to be coextensive with the-permanent prospective operation of the act.. IF, tibien, there is in this clause no positive or' implied bar to any action provided for, and if the clause is perfectly satisfied by deeming it to be what it professes on ..its face-to( be,, a regulation addressed to the collectors and other persons collecting duties, and directory to them, let us see if the subsequent clause* which contains the residue of the section, either enlarges, or qualifies, or repels the inferences drawn from the preceding clause. This clause is, “But whenever it shall be shown to the satisfaction of the secretary of the Treasury, that, in any case of unascertained duty or duties paid under protest, more money has been paid to the collector or other person acting as such, than the law requires" should have been paid, it shall be his duty to draw his warrant upon the treasurer in favour of the person or persons entitled to the over-payment, directing the said treasurer to refund the same .out of .any money in the Treasury not otherwise appropriated.” -
*259 This is the whole of the clause, and, unless I.am greatly deceived in its purport and effect, not,one word is fo-'be found therein which bars the party who has -paid the money from his right of action against the collector , or other persons acting as such to recover back the money illegally claimed, or which' compels such party to make his application or appeal sblely-to the secretary of the Treasury for redress, or gives to the latter exclusive power, jurisdiction, and final ■arbitrament in the premises. The true object of this clause seems_ to be precisely what its language imports, to give the secretary of the Treasury a power which he did not previously possess* to draw from the Treasfiry money which had been overpaid for duties when he was satisfied of such over-payment, upon the application of the party interested. It was not tq be compulsive on the party, that he should so apply, but he had an option to apply to the secretary, to save the delay and.expense of a protracted'litigation, if tiié secretary should grant him the desired relief. .It. would also diminish the necessity of applications to Congress for the repayment of money which had been illegally paid for duties, by enabling the-’sec'retary to- draw his warrant upon the Treasury for the amount;. which relief, when' the money had been paid into the Treasury,, could not before be obtained’ except by means of an act of Congress. It was, therefore, an auxiliary provision to the general rights of action secured to the party by the common law, and not in extinguishment or suspension of it. Whether the clause, clothed the secretary also with authority to draw a ^arrant in favour’of the party, if he recovered back the money in a suit at law against the collector, is a matter which might, upon the strict words of the clause, admit of some doubt,- since, the case provided for is only where the over-payment shall be shown to the satisfaction of the secretary, and not where it is a result of a. judgment-at law. Bata liberal construction might embrace such, a. case also, as within the intent, if not strictly within the words. But be this as it may, it is manifest to my mind, with all deference to the judgment of others, thatthe affirmative power thus given by this .clause to the secretary, cannot be-construed to exclude the right of the party to his remedy at the common law without a violation of the known rules of interpretation, by adding important and material language which the legislature has not used* and incorporating provisions which neither the words n'or the professed.objects of the section require.
Ñor am I able to perceive any grounds upon which a different interpretation can be’ maintained, unless it be, that it would be- á hardship upon the collector-to require him to pay money over to the government which Be might be compelled again to pay to the party from whom he had illegally demanded it. One answer, tq this suggestion is, that he cannot -complain, because it is his own choice to hold an' office to which ’ such a duty or responsibility is • attached, and if he elects to, hold it, he ought to take it cum onere. *260 Another and conclusive answer is, that ■ he has a perfect right of indemnity from the government'; nor can it be doubted that the government will always indemnify all its officers for acts done by its orders and demands made.undef its authority. On the other hand, an extreme hardship would be thrown upon the injured party, whose money is taken from him against his will by colour of office, and against his right, if his common law remedy is swept away; for then he can have no means of redress, and ho indemnity, since he has resisted the- demands of the government and asserts an adversary interest.
Nor is it any ground of. excuse, (as has been already suggested,) in case of money paid by compulsion, that the officer has paid over the money to his principal'; and in this respect- it differs from the casé of a voluntary payment. ,Thi's distinction was taken and acted upon in the case of Snowden v. Davis, 1 Taunt. R. 358, where money had been paid to a bailiff under a threat of a distress by an excéss of authority, and the money had been paid over by him' to the sheriff, and by the latter "into the exchequer. And the- same doctrine was fully recognised, and confirmed by this court upon the most solemn consideration in Elliott v. Swartwout, 10 Peters, 137, after a full review of all the leading authorities.
Upon the whole my opinion is, tiiát the question propounded by the Circuit Court upon the division of opinion of the judges in that court, ought to be answered in the negative, that the 2d section of the act of 3d of March, 1839, chap. 82, was no bar to the action.
Mr.- Justice McLEAN.
This suit was brought to recover from the defendant, collector of the customs, an excess of duties exacted by' him of the plaintiffs against law. And on the trial, iir the Circuit Court the judges were divided on the' question, “ whether the act of the 3d of March, 1839, was a bar to the action.” This point has been certified to this court.
The 2d section of the above act provides, “ that from and after ( the passage of this .act, all money paid to any collector of.the customs, or to any person acting as. such, for unascertained duties, or for duties paid under protest against the rate or amount of' duties charged, shall be placed to the credit of the treasurer of the United States, kept and. disposed of as all other money paid for duties is required' by law or by regulation of the Treasury Department to be placed' to the credit of the said treasurer,, kept and disposed of; and shall not be held by the said collector, or person acting as such, to await any ascertainment of duties &t the result of any litigation’ in relation to the rate or amount of duty legally chargeable and collectable in any case where money is so paid; but whenever it shall be shown to the satisfaction of the secretary- of the Treasury, that, in any case of unascertained duties or duties .paid .under protest, moré *261 money has been paid to the collector or person acting as such than . the law requires should have been paid, it shall be his duty to draw his warrant upon the treasurer in favour of th e person ór persons entitled to the over-payment, directing the said' treasurer to refund thé same out of any money in the Treasury not otherwise appropriated.”
In the case of Elliott v. Swartwout, 10 Peters, 137, and in Bend v. Hoyt, 13 Peters, 263, this, court held, that illegal duties exacted by the collector were recoverable from him, where paid under protest, by the .importer, in an action of assumpsit. This doctrine is not questioned in this country or in England. Has the 2d section of the act above cited changed the law in this respect?. . A majority of the judges havé decided in the affirmative, and that that act constitutes a bar to an action in such a case. I dissent from the opinion of the court.
The above section, in my judgment, so far from taking away the legal remedy, expressly recognises it. The collector is required, “ from and after the passage of the-aet,” to pay over to the treasurer the moneys in his hands, and not “to await any ascertainment of duties, or the result of any litigation-in relation to the rate or amount of duty legally chargeable,” &c. Now,- if Congress'intended by this section to withdraw this subject from the courts, and- vest the exclusive right to decide the matter-in the secretary of the Treasury, could they have used this language ? The law was not to operate upon the past, but upon the future acts of the-collector. And I ask in sober earnestness, whether the collector could be required to pay-over money, “ and not await the result of a litigation,” as “ to the amount of duties legally chargeable,” if the intention was to prohibit such litigation. I use the words of the sectiony and the words of the section-alone, as I think, are conclusive as to the intention of Congress. The.collector'must pay over the money, and not retain it until the termination of a suit. Does this take away the right to bring a suit ? Such an inference, it seems to me, would be as exceptionable in logic as in law.
From the proceedings of this court we' know that collectors of the customs alter their removal from office or the expiration of their. term, and sometimes while in office, under the pretext of indemnifying themselves against suits for the exaction of illegal duties, were in the practice of withholding from the Treasury large sums of money. And it was' to remedy this, evil, that the. above law’was passed. As to the -remission of duties illegally charged, it vested- in the secretary no new powers; but ^ authorizes him, where the excess of duty has been paid- into the Treasury, to- draw it out by a warrant, and pay it over to the person entitled to receive it. By the 21st section of the Duty Act of 1799, (1 Story, 592,) the collectors “were required, at all times, to pay to the order of the proper officer .the whole of the moneys which they may respectively receive, &c., and shall once in three months, or oftener if required, transmit their ác- *262 counts/’ &e. Now, it is known from public documents and from cases before this court, that the secretary of the Treasury has, for a long time before the act of 1839, required the collector of New York to pay over moneys received by him, weekly or at short intervals. And can it be pretended that the act of 1799, under the instructions of'the secretary of the Treasury, was not as binding upon collectors as the act of 1839 ? In a legal point of view the liability of a collector was the same for illegal duties received by him, whether paid into the Treasury under the one law or the other.
It is said that the law cannot raise a promise to pay by an officer, where it requires him to pay the same money into the Treasury. The action is founded on the illegality of the transaction. None other than legal duties are payable to the government; and where an officer by his own volition, or acting under the instreet:nns'of his superior, demands a higher duty than the law authorizes, ne is fuilty of a wrong which his instructions cannot justify. And having one this, can it be contended, that by paying over moneys so obtained he can escape the legal consequence of his unlawful act ? Where one person obtains money illegally from another, is he not bound in conscience to return it ? And may not an action of assumpsit be sustained for the recovery' of the money ? In such an action the question is, whether the defendant has received money which he is bound in good conscience, to pay to the plaintiff. Now, if the defendant, as collector, exacted a higher duiy of the plaintiffs than the law authorized, is he not bound in conscience to return the excess ? But it is said that he has paid it over to the Treasury of the United States, in pursuance of the act of 1839, and that hiis is a bar to the action. Why has not this bar been' set up under the act of 1799.? By that act the collector, when ordered by the secretary of the Treasury, was as much bound to pay over the money in his-hands into the Treasury as-under the act of 1839. And yet for forty-four years such a defence has not been thought of. It has never been supposed that the payment of the money into the Treasury exonerated the collector. He has violated the law, and he is answerable for that violation. This must'be the case, unless, in the language of this court in the case -of Elliott v. Swartwout above cited, “ the broad proposition can be. maintained, that no action will lie against a collector to recover back an excess of duties paid him, but that recourse must be had to the government for redress. Such a principle,’’.the court say, “would be carrying an exemption to a public officer beyond any protection sanctioned by any principles of law or sound public policy.” - ■ ■
In Townson v. Wilson et al., 1 Camp. 396, Lord Ellenborough says, “ If any person gets money into his hands illegally, he cannot discharge himself by paying it over to .another.” The same doctrine is held in Sadler v. Evans, 4 Burr. 1986. And this court in the above case of Elliott v. Swartwout say, “ It may be assumed as the *263 uttled doctrine of the law, that where money is. illegally demanded and received by an agent, he cannot exonerate himself from responsibility by paying it over to his principal, if he has had notice not to pay it over. A notice not to pay over the money to the principal, it is contended, presupposes a right in the agent to retain it'. .No such, inference could arise under the act of 1799, nor can it be made under- the present law. The notice should induce the collector to reconsider his act, and if found to have been against law.to correct it. But it is said, he may have acted under the orders of the secretary of the Treasury. Suppose he did, would that justify or excuse an illegal act ? I will answer this in the language of this court in the (Jase last cited: “ Any instructions from the Treasury Department could not change the law or affect the rights of the plaintiff. He; the collector, was not bound'to take and adopt that instruction. He was at liberty to judge for himself, and act accordingly.” And in Tracy v. Swartwout, 10 Peters, 99, this court say, that the personal inconvenience of the collector is not to be considered.” When acting under instructions the government is bound to indemnify him. In my judgment the. act of 1839 interposes no bar to this action.
But there is another aspect in which this case must be considered. Feeling, as_I do, an unfeigned respect for the opinion of the judges who differ from me, yet I cannot, without concern, look at the consequences of die principle established in this case. The right of a citizen to resort to the judicial tribunals of the country, federal or state, for redress for an injury done by a public officer, is taken away by the construction of an act of Congress, which, in my judgment, bears no such construction. But I will take higher ground, and say, that Congress have no constitutional power to pass such an act as the statute of 1839 is construed to be by this decision.
By the 2d section of the 3d article of the Constitution of the United States, the judicial power extends to all cases in law ánd equity arising under the Constitution .and laws of the union. And by the 7th section of the amendments to the Constitution it is provided, that “ in suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved.”
The act of 1839, in my judgment, does not conflict with either of the above constitutional provisions. But if it take away the right of the citizen to sue in a court of law for the injury complained of, as construed by my brethren, then it is in direct conflict with both of the above provisions.
. In a matter of private right it takes from the judiciary the power of construing the law, and vests it in the secretary of the Treasury; the executive officer under whose sanction or instruction the wrong complained of was done.
*264 And. in the second place it takes from the citizen the right of trial by jury, which is expressly given to'him by the Constitution.
I again repeat that Congress have not done this, nor did they intend to do it by the act of 1839. But the act is so construed by the decision just pronounced. Under this view, I feel myself bound to consider the principle established by the court, and to speak of its consequences.
That the act, as construed, is in direct conflict with the above provisions of the Constitution, is so palpable that it seems to me no illustration could make it clearer.
The right to construe the laws in all matters of controversy, is of the very essence of judicial power. Executive officers who are required to act under the laws, of necessity, must give a construction to them. But their construction is not final. When it operates injuriously to the citizen, he may, by any and every possible means through which it may be brought before the courts, have the con-' struction of the law submitted to them, and their decision is final.
But the court say, that the plaintiffs in this case cannot seek redress for the injury complained of, by an action at law, but, under the act of 1839, are referred to the secretary of the Treasury; an executive officer, who has prejudged the case, who can exercise neither the forms nor the functions of a judicial officer; who acts summarily, without a jury, and from whose judgment there is no appeal. The case turns upon facts; facts properly triable by a jury. The question is, whether the articles on which the duties have been assessed, are such articles as under the law are liable to be thus taxed. This is a question most fit to be answered by a jury of merchants, under the instructions of a court of law.- The plaintiffs allege that the duty was not authorized by law, but to obtain possession of their goods, they were compelled to pay it, protesting against the right of the government. And they brought an action at law to recover from the collector the excess of duty paid. This course had been sanctioned by previous decisions. It was, in fact, the only 'effectual course they could take to obtain possession of their goods. A tender of the legal duty, and a replevin, if it would lie, involved the necessity of security for a return of the góods which, if in the power óf the importers, might not have been convenient .to them. But a replevin is expressly prohibited in such a case by the act of 2d March, 1833.
The question arises on the facts stated. Illegal duties were demanded by the collector- and paid to him by the plaintiffs, before they could obtain their goods; and the question is, has their remedy at law been cut off- by the statute of 1839 ? This is a taxing power; the most delicate power that is exercised by the government. It reaches the concerns of the citizen, and takes from him a part of his property-for purposes of revenue. The tax should be judicious, and the mode of collecting it should be specially guarded. Care *265 should be taken not to infringe private right in making this public exaction. But, especially, where, in this respect, a wrong has been done to the citizen, the courts should be open to him. His remedy should be without obstruction. But my brethren say that the act of 1839 takes away from the plaintiffs all remedy except an appeal to the secretary. The state courts as well as the federal are closed against the injured party.
■ The able men who laid the foundations of this government saw that, to secure the great objects they had in view, the executive, legislative, and judicial powers, must occupy distinct and independent spheres of action. That .the union of these in .one individual or body of men constitutes a despotism. And every approximation to this union partakes of this character.
What_though no positive injustice be done to the plaintiffs in this case; is that any reason why the great principle involved in it should be yielded? What is this principle? It is nothing less than this; that' throughout the whole course of executive action, summary, diversified, and multiform as it is, for wrongs done the citizen, all legal redress may be withdrawn from him; and he may be turned over as a petitioner to the power that did the wrong. If this may be done in the case under consideration, it may, on the same principle, be done in every similar case.
A seizure of a vessel and cargo may be made by an officer under a supposed breach of the revenue law, and the question of forfeiture may be referred to the secretary of the Treasury. Private property may be taken for public purposes, and the owner may be limited to the remedy, if remedy it may be called, of petitioning some executive officer for remuneration. Military violence may be perpetrated on the person of a citizen or on his property, and his relief may be made to depend on the will of the commander-in-chief. In short, in every line of the executive power, wrongs may be done and legal redress may be denied.
The cases put may seem to be extreme ones, and therefore not likely to happen. But do they not test the principle? I think they do. If Congress may deprive these plaintiffs of their remedy by action at law, they may do the same thing in the cases specified. Indeed, it would be difficult to prescribe any limit to legislative action onthis subject. It can, at least, be extended through all the ramifications of executive power.
To say that this will never be done, and that the consequences spoken of can never happen, is no answer to the argument. • Do the consequences lie within the exercise of the principle ? If they do, the consequences must follow a general exercise of the power. The danger is in sanctioning the principle. At this point, I meet the principle and combat it. I object to it because it is dangerous and may be ruinous. It takes from the citizen his rights — rights secured to him by the Constitution'; the trial by jury, in a court of *266 . law. • This is done bv the act of 1839, if. it be what it is now construed to be. In this 'aspect,, then, I say, the act is unconstitutional and void. It not only strikes down the rights of the citizen, but it inflicts a blow on the judicial power of the country. It’unites, in the same department, the executive and judicial power. And on a subject the most delicate and interesting; and one which, of all others, may most easily- be converted into an engine of oppression.
In this government, balances and checks have been carefully adjusted, with a view to secure public and private fights; and any departure from this organization endangers .all. We'have less to apprehend from a bold and open usurpation by one department of the government, of powers which belong to- another, than by a more gradual and insidious course. In my judgment, no principle can • be more dangerous than the one mentioned in this case. It covers from legal responsibility executive officers. . In the performance of their ministerial duties, however they may. disregard and trample upon the rights of the citizen, he can claim no indemnity by an action at law. This doctrine has no standing in England. No ministerial officer in that country is sheltered from legal- responsibility. Shall we in this country be less jealous of private rights and of the exercise of- power ? Is it not our boast that the law is paramount, and that all are subject to it, from the highest officer of the country to its humblest citizen? But can this be the case if any or every executive officer is clothed with the immunities of the sovereignty? If he cannot be sued, what may he riot, do with impunity. I am sure that my brethren- are as sincere as I am, in their convictions of whát the law- is, in this case; and I have only to regret, that their views do not coincide with those I have stated.