146

(C. D. 1596)

The Specialty House, Inc.
Bryant & Heffernan, Inc., et al.
} v. United States

United States Customs Court, Second Division

(Decided March 18, 1954)

*Sharretts, Paley & Carter* (*Joseph F. Donohue, Howard C. Carter* of counsel); and *Brooks & Brooks* (*Frederick W. Brooks* of counsel) and *Green & Yanoff* (*Leo Yanoff* of counsel), associate counsel; for the plaintiffs.

*Warren E. Burger*, Assistant Attorney General (*Richard M. Kozinn* and *Richard H. Welsh*, trial attorneys), for the defendant.

Before Lawrence, Rao, and Ford, Judges

Ford, Judge: The two suits listed in schedule "A," hereto attached and made a part hereof, were filed by the plaintiffs seeking to recover certain sums of money alleged to have been illegally exacted as customs duties upon importations of silk articles from Japan. The collector classified this merchandise as handkerchiefs, hemmed, valued at not more than $5 per dozen, and levied duty thereon at the rate of 60 per centum ad valorem under the provisions of paragraph 1209 of the Tariff Act of 1930. Plaintiffs claim said merchandise to be properly dutiable at 35 per centum ad valorem under paragraph 1210 of said act, as modified, *infra*.

The involved paragraphs are as follows:

Paragraph 1209 of the Tariff Act of 1930:

Handkerchiefs and woven mufflers, wholly or in chief value of silk, finished or unfinished, not hemmed, 55 per centum ad valorem; hemmed or hemstitched, 60 per centum ad valorem.

Paragraph 1210 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802:

Clothing and articles of wearing apparel of every description, manufactured wholly or in part, wholly or in chief value of silk, and not specially provided for, 35% ad val.

At the trial of this case, it was agreed between counsel that the involved articles were valued at not more than $5 per dozen, and that they are hemmed. It was also agreed between counsel that the article marked exhibit 1-a is representative of the merchandise described on the invoice as silk habutae squares, 17 inch, Grade A, 5 momme, except that the merchandise in controversy does not have any drawn work on the corners as does exhibit 1-a; that the article marked exhibit 1-b is representative of the merchandise described on the invoice as 4 momme, ombre; and that the merchandise marked exhibit 1-c is representative of the merchandise described on the invoice as 17¼ inch, 4 momme, prints. There were also admitted in evidence as collective illustrative exhibits 2-a, 2-b, and 2-c, three articles representative of 3-momme, 17¼-inch, habutae squares, the purple article being the solid color; the green article, the ombre shade; and the multicolored article, the print. Collective exhibit B was admitted in evidence as representing the merchandise in exhibits 1-a, 1-b, and 1-c.

There was also admitted in evidence a group of colored photographs depicting the various uses of the involved merchandise. These were marked illustrative exhibits 4, 5, 7, 8, 9, 10, 12, 13, 14, and 17. A shadow box was admitted in evidence as exhibit 3. Exhibit 6, illustrative exhibits 11 and 15, and exhibit 16 were admitted in evidence as illustrating the uses of the involved merchandise. Collective illustrative exhibit 18 consists of three of the involved articles knotted together to form a sun halter, as depicted in illustrative exhibit 17. Illustrative exhibit 19 shows a use of one of the involved articles, as depicted by illustrative exhibit 12. Collective illustrative exhibit 20 shows another use for the involved articles, as illustrated by Miss Avedon in illustrative exhibit 12.

Exhibit 21 was admitted in evidence as illustrating an article made from merchandise similar to the involved articles. Illustrative exhibits 22 and 23 are pallettes used in displaying the involved merchandise. Exhibit 24 shows merchandise such as or similar to that here involved being used to hold sandals or other footwear on the foot. Exhibit 25 is a trade catalog of The Specialty House, Inc., one of the

plaintiffs herein, in which certain items were marked with an "X" which are like the involved articles. Exhibit 26 was admitted in evidence as illustrating an article which is referred to as a scarf in the trade. Collective exhibit 27 is seven sets of orders taken from the commercial files of The Specialty House, Inc. Collective exhibit 28 is a price list of Baar & Beards, Inc., of Chicago, Ill., on which has been placed an "X" to indicate merchandise similar to that here involved. Exhibit 29 is a piece of literature circulated by Baar & Beards, Inc., and the article similar to that here involved has been marked with an "X." Exhibit 30 is a color card circulated by Baar & Beards, Inc.

Collective exhibit B was admitted in evidence as being similar to exhibits 1-a, 1-b, and 1-c, except they are of better quality and heavier in weight. Collective exhibit 31 was admitted in evidence as representative of merchandise offered and sold by one witness as silk handkerchiefs. Exhibit 32 was admitted in evidence as representing merchandise which one witness sold as silk handkerchiefs throughout the United States in the early 1930's.

In addition to the above, the record consists of 451 pages, comprising the testimony of 11 witnesses for the plaintiffs and 5 witnesses for the defendant. A detailed narration of the testimony in this case would extend this opinion to unwarranted length.

Based upon the record in this case, it is the contention of counsel for the plaintiffs that:

1) In physical characteristics, uses and in name the imported articles are scarfs and not handkerchiefs.

2) The commercial designation of the term "handkerchiefs" as used in Paragraph 1209, was definite, uniform and general throughout the United States on and prior to June 17, 1930. It did not include articles like those at bar. Therefore, they are not dutiable as handkerchiefs.

3) The imported articles are known commonly and commercially as scarfs and are dutiable as wearing apparel.

Counsel for the defendant states the issue and its contention as follows:

### THE ISSUE

Whether the involved articles are silk handkerchiefs within the purview of paragraph 1209, *supra*, as classified, or are silk wearing apparel, not specially provided for, under paragraph 1210, *supra*, as claimed.

### THE GOVERNMENT'S CONTENTIONS

1. The evidence of use, how sold, and where sold, does not establish that the articles at bar are not handkerchiefs within the meaning of that term, as set forth in the case of *Geo. S. Bush & Co., Inc.* v. *United States*, 29 Cust. Ct. 395, Abstract 56928.

2. The legislative history bears out the classification of the Collector to be correct.

3.  Plaintiffs have failed to establish a commercial designation different from the common meaning of the term handkerchief.

William J. Norris, testifying for the plaintiffs, stated that he was the examiner of merchandise at the port of New York who examined the involved merchandise and described it for the collector as hemmed silk handkerchiefs; that he is familiar with silk mufflers and that exhibits 1-a, 1-b, and 1-c do not represent woven silk mufflers as they are of a different size and weight; and that the merchandise represented by said exhibits is used entirely by women and girls. Later in the trial, this witness made it clear that his knowledge of the use of this merchandise covered a period of only 2½ years.

Mortimer L. Taylor, called by counsel for plaintiffs, stated that he was vice president of The Specialty House, Inc., one of the plaintiffs herein, manufacturer, importer and dealer in ladies' scarves, neckwear, various accessories, and novelty items; that his firm sells at wholesale; that his duties include executive and administrative details, as well as foreign buying, and supervision of styling and manufacturing, both domestically and foreign. The witness was directly responsible for the manufacture and production of many articles in the United States and was responsible for all foreign purchasing.

Witness Taylor stated that he had been engaged in the textile business from his youth; that he had handled the selling and credit work of his father's silk mill in New York; that he opened a second silk mill and installed a superintendent; that he then returned to Massachusetts and started another mill, where he worked until 1939; that he was then employed for 14 or 15 months as manager of a newly organized rayon department of another company; that he then went into the textile brokerage business until he was employed by the Government as a textile expert in the Office of Price Administration; that, in 1943, he was called to active duty with the United States Army and discharged in 1946, when he joined The Specialty House, Inc.

The witness further testified that in his present position he is required to travel extensively, particularly to the European fashion centers; that it is a part of his present duties to make a study of style trends; that, based upon his studies and experience, he had found that articles like exhibits 1-a, 1-b, and 1-c became significant in the wholesale market about 1948. Through this witness, the colored photographs, heretofore alluded to, were introduced in evidence, and he was able to demonstrate the various uses of exhibits 1-a, 1-b, and 1-c with two living models and the colored photography. The value of this evidence is more vividly demonstrated by use of the photographs in connection with the explanations given by this witness than is possible to portray in words.

The witness also testified that exhibits 1-a, 1-b, and 1-c have been sold by his firm for the past 4 or 5 years; that the proper stocking of them requires 15 or 20 different colors and 12 or 15 different prints, each print being carried in 4 or 6 color combinations; that the ultimate user of the article was purchasing it for its color value. So important was this item of color, that salesroom displays were designed to display the color value of these articles. These are in evidence as illustrative exhibits 22 and 23.

This witness also testified that The Specialty House, Inc., sold this merchandise to jobbers, retail stores, and national chain stores, such as Sears, Roebuck; Montgomery Ward; S. S. Kresge; and J. C. Penney. The department stores in its accounts were located throughout the United States, and its mailing list contained over 4,000 names, of which 1,500 to 2,000 were active accounts. When the witness had conversations with the various buyers, articles such as exhibits 1-a, 1-b, and 1-c were generally referred to as "18-inch squares," "silk squares," and "small squares." These articles are invoiced by his company as silk squares, and orders request the articles in the same manner or by style number.

Merchandise such as and similar to exhibits 1-a, 1-b, and 1-c is ordered by the neckwear department, is delivered to the neckwear department, and bills and invoices therefor are sent to the neckwear department. The Specialty House, Inc., sold approximately thirty-five thousand dozen articles like exhibits 1-a, 1-b, and 1-c annually. None of these articles had ever been sold to the handkerchief department nor had they been invoiced as handkerchiefs. It is the trade custom to allow an 8 per centum discount on scarves, and this discount was allowed on articles like exhibits 1-a, 1-b, and 1-c. Exhibits 1-a, 1-b, and 1-c are not suitable for use as handkerchiefs because they are too light in weight and too porous, and would not hold anything if used as handkerchiefs.

Miss Jean Alexander, one of the models in the photographic exhibits, heretofore alluded to, was called as a witness for the plaintiffs. She testified that she is an actress and does modeling; that she has appeared on the radio, television, in the movies, and on the stage; that as an actress she considered it a part of her business to study modes and fashions; that she has used articles like exhibits 1-a, 1-b, and 1-c in the manner shown by the photographs; that she had never seen exhibits 1-a, 1-b, and 1-c used as a handkerchief; that she had never used either of these exhibits to wipe her nose, face, or eyes. On cross-examination, the witness disagreed with the definition of a handkerchief, as given in Webster's New Collegiate Dictionary, and with the definition of a handkerchief, as given in the *Bush* case, *supra*. The witness admitted, however, that she would use exhibit 1-c as a neckerchief.

Counsel for the plaintiffs called as their next witness Julius Ruderman, president of Marvin Accessories, Inc., who had been engaged in the importation, manufacture, and sale of women's scarves since 1922, handling articles like exhibits 1–a, 1–b, and 1–c of 4- and 5-momme habutae silk. The witness testified that he sold such merchandise all over the United States to jobbers and wholesalers and described the article on the invoices as 18-inch scarves; that such designation has been used since 1948 to describe articles like exhibits 1–a, 1–b, and 1–c; that articles similar to exhibits 1–a, 1–b, and 1–c have been imported by him since 1922 and sold by him in the trade as scarves; that, from 1922 to the present day, articles like exhibits 1–a, 1–b, and 1–c have been used as wearing apparel around the neck as a scarf; that, since 1922, articles like exhibits 1–a, 1–b, and 1–c have been sold in the trade as scarves and that trade designation has been definite, uniform, and general throughout the United States; and that the uses made of exhibits 1–a, 1–b, and 1–c, as shown by illustrative exhibits 4, 5, 7, 8, 10, 11, 12, 13, and 17, are uses made of scarves like exhibits 1–a, 1–b, and 1–c.

Plaintiffs called as their next witness Sado Goldenberg, who has been engaged in the scarf and ladies' neckwear business since 1911. This witness testified that among other things he had sold articles like exhibits 1–a, 1–b, and 1–c to department stores throughout 14 or 15 Far Western States; that articles like exhibits 1–a, 1–b, and 1–c are referred to in the trade as scarves; that in purchase orders they are called scarves; that the customary discount in making a sale of scarves is 8 per centum, provided the bill is paid within 10 days after the end of the month; that articles like exhibits 1–a, 1–b, and 1–c are never sold in the handkerchief department but always in the scarf department, and the 8-per centum discount is always allowed.

The witness, when interrogated by the court, answered as follows:

JUDGE LAWRENCE: Let me put it this way. When you first began—when did you first begin to deal in silk scarves?

THE WITNESS: They have been good as far as I can remember.

JUDGE LAWRENCE: That is prior to 1920?

THE WITNESS: Yes.

JUDGE LAWRENCE: And have you been familiar with their uses up to date?

THE WITNESS: Yes.

JUDGE LAWRENCE: Have their uses been the same over that period?

THE WITNESS: They have.

Plaintiffs called as their next witness Frank A. Fuller, who stated that he had been associated with Alfred Kohlberg, Inc., for 29 years and at the present is a salesman and junior vice president; that his firm imports and sells handkerchiefs and scarves; that he had been engaged in the sale of handkerchiefs since 1902, and had sold handkerchiefs for the Kohlberg firm since 1923; that his firm did not handle

152

scarves like exhibits 1–a, 1–b, and 1–c until about the end of 1951; that in the sale of scarves and handkerchiefs he had come in contact with buyers from all over the country; that, prior to 1923, he traveled for 25 years all over the country selling handkerchiefs; that he had sold handkerchiefs throughout the United States for approximately the same length of time with only a few periods of interruption; that his sales since 1924 had been continuous, and, based upon his contacts with purchasers and his experience in the trade in making such sales during all of that time, he stated that the term "handkerchief" had a definite and uniform meaning throughout the trade in the United States.

Counsel read to the witness the definition quoted in the *Bush* case, *supra*, as follows:

Handkerchief. 1. A small piece of cloth usually square and often embroidered or laced, carried for wiping the face, nose, or eyes. 2. A piece of cloth shaped like a handkerchief worn about the neck; a neckerchief; a neckcloth.

The witness then stated that the trade understanding of "handkerchief" agrees with the first part of said definition but not with the second part of the definition. In the trade, a handkerchief is for the nose, eyes, and face. A piece of cloth shaped like a handkerchief worn around the neck is not such an article as the trade would refer to as a handkerchief. A neckerchief or neckcloth is not within the trade understanding of a handkerchief.

Q. Mr. Fuller, can you give us some approximate idea of the number of dozens of handkerchiefs that you have sold in the year 1930 or the value of those handkerchiefs? * * *—A. Well, I think it would be around 300,000 dozens.

Q. Were those sales that you made personally?—A. No, the firm.

Q. And did you participate in those sales?—A. In those days I was selling about $400,000 worth of handkerchiefs.

Q. In the years 1929 and 1930, were your sales around that magnitude?—A. I think so, around that time.

Q. Now, is the trade definition that you gave of the term handkerchief—was that definition in the trade from 1924 to the present time?—A. In my experience, yes.

\*        \*        \*        \*        \*        \*        \*

Q. I ask you specifically from 1924 to the present time, whether articles like Exhibit 1a, 1b, and 1c have been sold by you as handkerchiefs?—A. Never.

Q. Have you ever seen them offered for sale by any other salesman as handkerchiefs?—A. Never.

The witness testified further that his sales of handkerchiefs since 1924 had always been to the handkerchief department, and never to the scarf department; that the customary discount for handkerchiefs is 3 per centum, which was uniformly given and was given by him in the sale of handkerchiefs; that the customary discount on scarves is 8 per centum, that scarves like exhibits 1–a, 1–b, and 1–c were never

sold with a 3 per centum discount, nor were handkerchiefs sold with an 8 per centum discount; that the No. 1 definition of a handkerchief, used in the *Bush* case, *supra*, has been definite, uniform, and general in the trade of the United States since 1924, and it is the definition uniformly accepted today.

On cross-examination, the witness testified that Alfred Kohlberg, Inc., has never handled silk handkerchiefs; that he has never bought or sold a silk handkerchief in the trade and commerce of the United States since 1924; that, when he speaks of handkerchiefs, he means cotton and linen handkerchiefs; that his definition of a silk handkerchief is the same as his definition of a linen handkerchief used for the purpose of wiping the eyes, nose, or face.

Plaintiffs' next witness was Milton Beards, who was one of the owners of Baar & Beards, Inc., a firm engaged in the business of importing and manufacturing ladies' scarves and neckwear. This witness testified that in the course of his business, since 1928, he came in contact with the buyers, saw all of the orders placed with the firm, formulated the price lists, and supervised the advertising literature of the firm; that the trade name of articles like exhibits 1-a, 1-b, and 1-c, based upon his experience, was 18-inch squares or small squares; that his firm sold a minimum of 200,000 dozen articles like exhibits 1-a, 1-b, and 1-c annually for the past 6 years.

The witness testified further that, in selling scarves or squares, the normal discount is 8 per centum; that articles like exhibits 1-a, 1-b, and 1-c are always sold as scarves or squares and with a discount of 8 per centum; that the term "scarves" or "squares" is used interchangeably and that buyers ordering squares realize that they are getting scarves; that the term "square" has recently become more popular because a few years ago scarves were rectangular in shape; that when this square article became popular, purchasers ordered silk squares in order to distinguish them from scarves.

Herbert Robinson testified next for the plaintiffs, stating that he had been engaged in the business of selling and manufacturing handkerchiefs for about 30 years, with the firm of Robinson & Golluber of New York City; that his firm had imported articles like exhibits 1-a, 1-b, and 1-c for about 5 years; that he had been manufacturing and selling handkerchiefs for 30 to 35 years, men's, women's, and children's, and had traveled throughout the United States in making such sales, although he had not traveled within the past 25 years; that he was traveling throughout the United States long prior to 1930, selling handkerchiefs to retail stores, specialty stores, and department stores; that he came in contact with the buyers in the course of his travels, and, at the firm's showrooms in New York, he continued to greet every customer, thus coming in contact with buyers from every section of the United States.

The witness testified further that the No. 1 definition quoted in the *Bush* case, *supra*, reflected the trade understanding of the term "handkerchief," which was definite, uniform, and general throughout the United States; that he had sold quite a lot of articles like exhibits 1–a, 1–b, and 1–c; that he had never offered them for sale as handkerchiefs but always as scarves; that the customary discount allowed in the sale of scarves was 8 per centum, while the customary discount allowed in the sale of handkerchiefs was only 3 per centum. It was suggested by one of the judges that years ago on the farm he wore a handkerchief around his neck, but the witness stated that that was a bandanna; that ladies do not wear bandannas, but do wear articles like exhibits 1–a, 1–b, and 1–c around the neck, around their hair, and also as an armband; that, when they are worn around the neck, they are worn for ornamental purposes and that they could not be used for wiping the nose.

Edward Ezrol, also with the firm of Robinson & Golluber for 29 years, was the next witness to testify for the plaintiffs. He testified that he was manager of the scarf department and had held this position since 1929 or 1930; that he had been selling scarves during all of the aforesaid period, and had carried the plain colors, ombre shades, and prints like exhibits 1–a, 1–b, and 1–c since 1948 or 1949; that he had sold such merchandise to retail stores throughout the United States and had come in contact with purchasers in making such sales; that its scarves had been sold in every section of the United States, and that its annual sales volume had exceeded one million dollars for several years; that, in making such sales, articles like exhibits 1–a, 1–b, and 1–c were described to the customers as 18-inch scarves or squares and are never sold as handkerchiefs; and that articles like exhibits 1–a, 1–b, and 1–c receive the customary 8 per centum discount given on scarves, and only 3 per centum on handkerchiefs.

The witness testified that he had also sold handkerchiefs throughout the United States during the years 1928 to 1931, the annual volume of such sales being about $75,000; that during the aforesaid time there was a definite understanding in the trade of the term "handkerchiefs"; that such understanding was essentially the No. 1 definition of a handkerchief quoted in the *Bush* case, *supra*; that the No. 2 definition was not within the trade understanding of what he was selling as a handkerchief; that handkerchiefs, as such, were not worn around the neck or in any other place for warmth; and that the trade understanding of the term "handkerchief," which he described as coinciding with the No. 1 definition, *supra*, and which was acceptable in 1928 to 1931, is the same definition that is generally accepted throughout the trade today.

The defendant's first witness was John H. Kimball, who testified that he was in charge of the firm of J. H. Kimball, Inc., and that

said firm was engaged in the business of manufacturing scarves and handkerchiefs; that his association with the firm began in 1932 and for 6 years prior to that he was in a similar business, but mostly importing; that he sold scarves, handkerchiefs, and table linens; that his firm had manufactured articles like exhibits 1–a, 1–b, and 1–c on and off for 20 years; that he "guessed" he had sold articles like exhibits 1–a, 1–b, and 1–c, which he identified as handkerchiefs, neckerchiefs, kerchiefs, or silk squares. "They are known by all of these various names."

The witness also testified that he had sold at wholesale throughout the 48 States articles like exhibits 1–a, 1–b, and 1–c, and that such articles had been sold as handkerchiefs; that the term "handkerchief," as quoted in the *Bush* case, *supra*, conforms to *his* understanding of the term; that the average woman would not buy exhibit 1–a to wipe her nose, but would rather use it to tuck in her wrist or belt, to wear as a costume "picker-upper"; that, for the 26 years he had been in business, the use of these articles varied from time to time; that during the time he had been in business the general understanding of the term "scarf" was an oblong piece of fabric of various dimensions or a square fabric 24 inches or over; that he had sold articles like exhibits 1–a, 1–b, and 1–c both as handkerchiefs and as scarves, but, prior to June 17, 1930, they were sold a great deal more as handkerchiefs. The court called the attention of the witness to the fact that he had been referring to the involved merchandise as squares, whereupon he explained that he usually referred to these silk decorative items as squares, while cotton and linen articles of the same character were more likely to be called handkerchiefs.

The witness also testified that most department stores draw a line between what their handkerchief department and their scarf department will carry at 24 inches, but later stated he "would not say" that the department stores do not buy as a scarf anything that is less than 24 inches square. He also testified that he was aware of the fact that scarf dealers in the United States, such as Baar & Beards, Inc., and The Specialty House, Inc., which he did not regard as handkerchief houses, do sell articles such as exhibits 1–a, 1–b, and 1–c. Collective exhibit B was admitted in evidence as representing merchandise manufactured by the witness, which he testified was similar to exhibits 1–a, 1–b, and 1–c. The witness testified further that articles of cotton or linen, from 9 to 13 inches, would be entitled only to a 3 per centum discount, and that articles such as collective exhibit B are sold to scarf departments.

Defendant's second witness, Robert L. Demarest, testified that he was president of Robert L. Demarest, Inc., and that he had been engaged in the handkerchief business since 1938, and that he had been associated with Benjamin Wolf & Co. from 1923 to 1938; that with the

latter firm he sold Japanese silk handkerchiefs, but his own firm handles only cotton and linen handkerchiefs; that when he was with Benjamin Wolf he sold articles like exhibits 1–a, 1–b, and 1–c as handkerchiefs throughout the territory of Philadelphia and Washington; that articles like exhibits 1–a, 1–b, and 1–c were in existence prior to 1930 and were not known by any other name than handkerchiefs; that they were generally and uniformly sold throughout the United States by Benjamin Wolf as handkerchiefs.

On cross-examination, the witness testified that he carried a full line of cotton and linen, printed and embroidered, handkerchiefs, but no silk handkerchiefs; that he knew nothing about merchandise like exhibits 1–a, 1–b, and 1–c, and insisted that he had no competency to answer anything about this type of merchandise at the present time; that he never comes in competition with such articles in the sale of his handkerchiefs.

The defendant's next witness, Harry Gintel, was associated with New York Creations, Inc., jobber and distributor of belts, jewelry, and wallets to the haberdashery trade, as well as handkerchiefs. He testified that his firm manufactures cotton and linen handkerchiefs; that he sells these handkerchiefs throughout the eastern and middle western parts of the United States, and also handles sales in the New York office, to which buyers come from all over the country; that, from 1914 until 1928, he was associated with J. R. Simon & Co.; that it was an importer of silk piece goods and silk handkerchiefs; that he had sold articles like exhibits 1–a, 1–b, and 1–c from 1914 to 1928 throughout the United States and that such articles had been sold as handkerchiefs; that men used such articles as pocket handkerchiefs; that, from 1928 to 1950, he had been associated with the firm of Schlesinger & Gintel, engaged in importing silk handkerchiefs from Japan and handling domestic handkerchiefs; that the domestic handkerchiefs were silk and rayon; that articles such as exhibits 1–a, 1–b, and 1–c were sold at wholesale to the trade and commerce of the United States as handkerchiefs. With reference to the size of articles which he had seen used as handkerchiefs from 1914 to the present time, the witness was questioned and answered as follows:

Q. Did you observe other sizes?—A. Yes, sir.
Q. What size would they be?—A. 72 inches.
Q. Nothing smaller than that?—A. No, sir.

When read the definition of a handkerchief quoted in the *Bush* case, *supra*, the witness stated that he agreed with the definition, except it was not quite broad enough, because they had sold the bulk of these silk handkerchiefs for decorative purposes, not to wipe the nose. The witness also testified that, for the 39 years he had been in business, articles like exhibits 1–a, 1–b, and 1–c he had always under-

stood to be handkerchiefs, and that term was definite, uniform, and general in the trade and commerce of the United States.

Cross-examination of this witness developed that in 1926 through 1928 his experience was limited to sales in some of the southern states, as far west as Indianapolis, and in New York City; that exhibits 1-a, 1-b, and 1-c are not known as scarves; that they were never ordered as silk squares in those sizes, but, in the 36-inch size, they were ordered as silk squares; that the 22-inch size was imported as neckerchiefs; and that the 22-inch size, even though worn about the head, was considered as a neckerchief.

Harry H. Weider testified next for the defendant that he was the owner of the Cadillac Handkerchief Co. since 1945; that the handkerchiefs manufactured by his firm are cotton and rayon and that he imported some silk handkerchiefs; that he sells these handkerchiefs in the wholesale trade and commerce and that his territory takes in practically the entire United States; that he personally makes sales in New York and that he has representatives on the Pacific Coast who sell for him; that, from 1920 to 1941, he was connected with A. S. Rosenthal Co., importer of silk handkerchiefs and silk piece goods; that, in 1920, he was a salesman for that firm and later became sales manager; that he personally traveled, selling from New York to Denver, Colo.; from New York to Massachusetts; from New York to Florida; that as sales manager he covered the balance of the country from the Atlantic to the Pacific Oceans.

The witness testified further that the articles he sold as handkerchiefs, like exhibits 1-a, 1-b, and 1-c, were made of crepe de chine, palace crepe, and various other materials, but that he has not sold articles like exhibits 1-a, 1-b, and 1-c as handkerchiefs since 1945. At first, the witness stated that articles that are designed to be worn by men around the neck were sold by him as handkerchiefs, but he then stated that he could not say whether such articles were included in the trade understanding of handkerchiefs today, because he was not in that business; that he did not know what the trade understanding of handkerchiefs included for 1952. The witness finally stated that everything up to 27 inches would be considered a handkerchief, and everything over 27 inches square, composed of silk or cotton, would be considered a scarf.

It was then stipulated between respective counsel that if Mr. David Greenfeld were called as a witness on behalf of defendant his qualifications and his testimony, both on direct and cross-examination, would be similar in all material respects to the testimony given by and the qualifications of Mr. Weider.

William J. Norris was called by the defendant and testified that his experience with the use of articles such as exhibits 1-a, 1-b, and

1-c was from August 1950 and that he had no knowledge of their use prior to that time.

William A. Swan was called by the plaintiffs in rebuttal, who testified that he is associated with the firm of Sankyo Seiko Co. of Yokohama, Japan, importing scarves; that, from 1923 to 1938, he was importing squares, scarves, kimonas, and coolie coats from Japan; that he sold the men's silk handkerchiefs which he imported throughout the entire United States in quantities estimated at one-half million dollars annually; that exhibit 1-a was never sold as a man's silk handkerchief; that exhibit 31 was typical of articles sold as silk handkerchiefs, being designed for men; that exhibit 32 is a typical man's handkerchief made of heavy crepe with a woven stripe pattern; that exhibit 32 is a 12-momme crepe and is entirely different from the 4-momme habutae article like exhibit 1-b; that exhibits 1-a, 1-b, and 1-c were never sold as men's handkerchiefs; that he was familiar with the merchandise handled by Benjamin Wolf; and that said firm handled articles such as exhibits 1-a, 1-b, and 1-c as well as exhibit 31.

Plaintiff's next rebuttal witness was Miss Marie D. Ardito, who testified that she was associated with the firm of W. T. Grant Co. as a buyer; that said firm has a chain of 500 retail stores located in practically every section of the United States; that she has been engaged in buying handkerchiefs and neckwear for said firm since 1943; that, prior thereto, she was engaged from 1938 until 1943 as a handkerchief buyer for Hahne & Co. of Newark, N. J.; that she purchased merchandise like exhibits 1-a, 1-b, and 1-c as scarves; and that they were so classified by W. T. Grant Co.

On cross-examination, the witness testified that she visits various stores in and out of New York to check on the departments and see whether the merchandise is handled properly, sold according to the classification, and priced accordingly; that exhibits 1-a, 1-b, and 1-c were always bought as scarves and classified as scarves by her company, and never as handkerchiefs.

Counsel for the respective parties then stipulated that if Mr. Mario R. Pellacani were called as a witness he would testify that he was an executive of F. W. Woolworth Co., operating a chain of 2,000 retail department stores of the type commonly known as the 5-and-10-cent stores throughout the United States; and that articles such as exhibits 1-a, 1-b, and 1-c have been classified by said company throughout all its stores since 1945 as scarves.

A stipulation to the same effect covered the testimony of Joseph F. Mitchell, district manager of S. S. Kresge Co., operating a chain of 360 retail stores throughout the United States.

Counsel for the defendant appears to rely upon our decision in *Geo. S. Bush & Co., Inc.* v. *United States*, 29 Cust. Ct. 365, Abstract

56928, as supporting its contention herein. In that case, only one witness testified, and her testimony was set out in our opinion as follows:

At the trial, one witness testified for the plaintiff that she has been employed for the past 10 years by Best's Apparel, which operates a specialty shop; that she was familiar with the merchandise in question and that it comes in 42 different colors; that the staple colors are obtained from a local scarf house, but that all these fantastic colors are made only in France; that they are used to accentuate colors in women's costumes, being sold mostly in pairs; that as a rule young girls will buy one to pick up a color on her skirt or sweater and will tie them around their neck with a small knot, but most of them are sold in pairs; that they pick up the color of the outfit and they also pick up a color that compliments the woman's complexion or wardrobe; that they are a fill-in for a suit, and they are tied in a knot at each corner, leaving very little bulk at the back of the neck where a scarf usually feels bulky.

\*   \*   \*   \*   \*   \*   \*

The witness testified further that Strauss & Muller is strictly a scarf house that does not sell handkerchiefs; that Best's Apparel does not sell articles like illustrative exhibit 1 in the same department in which they sell hand kerchiefs; that she buys handkerchiefs as well as scarfs; that there is a great deal of difference between a handkerchief and a scarf; that a handkerchief is something you use for your nose; that lacy and elaborate evening handkerchiefs are carried tucked under a bracelet or belt or hanging from a pocketbook and are not large enough to be wrapped around the neck like illustrative exhibit 1; that Best's Apparel would never buy handkerchiefs in all of the colors of the imported articles now in question, and that she had never seen articles like illustrative exhibit 1 being used in the manner that handkerchiefs are commonly used; that this merchandise was ordered as 18-inch squares, and that if they received what they wanted, their being called "handkerchiefs" on the confirmation or invoice would not have led to a rejection of the merchandise.

There was also quoted in the decision in the *Bush* case, *supra*, the following definition of the term "handkerchief," as found in Webster's New International Dictionary, 1949:

Handkerchief. 1. A small piece of cloth usually square and often embroidered or laced, carried for wiping the face, nose, or eyes. 2. A piece of cloth shaped like a handkerchief worn about the neck; a neckerchief; a neckcloth.

The decision in the *Bush* case, *supra*, was concluded as follows:

In the instant case it must be presumed that the collector found every fact to exist that was necessary to sustain his classification. Therefore, the presumption is that the merchandise in question consists of small pieces of cloth, approximately 18 inches square, carried for wiping the face, nose, or eyes, or that it consists of a piece of cloth shaped like a handkerchief worn about the neck. Plaintiff had the burden of overcoming this presumption by competent evidence. This it has failed to do.

It is obvious from the conclusion reached in the *Bush* case, *supra*, that the court, based upon the record therein, did nothing more than find that the presumption of correctness attaching to the classification of the collector had not been overcome by the testimony of the one

witness. Having found this as a fact, any further expression of opinion therein would have been *obiter*. It is, therefore, clear that the defendant herein can find no aid or comfort in the *Bush* case, *supra*, in support of its contention in the present case. A consideration of the testimony in the *Bush* case, *supra*, as above set out, and the testimony in the present case, as hereinbefore detailed, renders obvious the difference in quality, quantity, and character of the testimony in the two cases, and requires no further comment here.

It is fundamental that commercial designation is a fact which must be proved in each case, like any other fact, by the weight of the competent evidence. *Seeberger* v. *Schlesinger*, 152 U. S. 581.

The weight of the evidence establishes that on and immediately prior to June 17, 1930, there was, as to the No. 2 definition quoted in the *Bush* case, *supra*, a difference between the common and commercial meaning of the term "handkerchief"; that such commercial meaning of the term "handkerchief" was definite, uniform, and general throughout the trade and commerce of the United States; that such commercial meaning covered and included a small piece of cloth, usually square, carried by a person for wiping the face, nose, and eyes, but did not cover and include a piece of cloth shaped like a handkerchief worn about the neck, a neckerchief, or neckcloth, whether such cloth was composed of cotton, linen, silk, or other material.

The weight of the evidence also establishes that the involved merchandise is used by women and girls in their hair, combined with pearls and other jewelry and worn around the neck, as color accents on different articles of wearing apparel, as a fichu around the collar of a suit and in lieu of a blouse, as a color accent at the waistline or the ankle or on a pair of slippers, and that such uses are the chief uses of the involved merchandise. Whether the involved merchandise is worn around the neck or otherwise, it is always worn by women and girls as an ornament, as a style accessory, and as a picker-up for other articles of wearing apparel. It is never carried or used for wiping the face, nose, or eyes.

The evidence further establishes that the involved merchandise is known and dealt in commercially as scarves or squares, and never as handkerchiefs; that there is a trade discount of 8 per centum on scarves and squares and a trade discount of 3 per centum on handkerchiefs; and that the involved merchandise is uniformly granted the 8 per centum discount applicable to scarves and squares. When it is considered that W. T. Grant Co. has 500 retail stores, F. W. Woolworth Co. has 2,000 retail stores, and S. S. Kresge Co. has 360 retail stores throughout the United States, in addition to perhaps thousands of other stores throughout the United States, all of which are accorded the 8 per centum discount in purchasing the involved merchandise, much weight attaches to the fact that the involved mer-

chandise is accorded the 8 per centum discount, rather than the 3 per centum discount accorded in the sale of handkerchiefs. No argument is required to establish that if in the trade throughout the United States the involved merchandise were known, and bought, and sold, and used, as handkerchiefs, it would be accorded only the 3 per centum discount and not the 8 per centum discount applicable to scarves or squares.

In the case of *Two Hundred Chests of Tea*, 22 U. S. 428, 6 L. ed. 128, in dealing with the question of commercial designation, the Supreme Court of the United States said:

The argument on behalf of the United States, is, that the two hundred chests of tea, now in controversy, are in reality simple congo tea, and not bohea; that the latter is a pure unmixed tea, entirely distinct from congo, and known in China by an appropriate name; that it is to this pure and unmixed bohea tea, that the successive act of Congress refer, and not to any other mixed tea, though known by the common denomination of bohea. If we were to advert to scientific classifications for our guide on the present occasion, it is most manifest, from the works cited at the bar, that bohea is a generic term, including under it all the black teas, and not merely a term indicating a specific kind. But it appears to us unnecessary to enter upon this inquiry, because, in our opinion, Congress must be understood to use the word in its known commercial sense. The object of the duty laws is to raise revenue, and for this purpose to class substances according to the general usage and known denominations of trade. Whether a particular article were designated by one name or another, in the country of its origin, or whether it were a simple or mixed substance, was of no importance in the view of the legislature. It did not suppose our merchants to be naturalists, or geologists, or botanists. It applied its attention to the description of articles as they derived their appellations in our own markets, in our domestic as well as our foreign traffic. And it would have been as dangerous as useless, to attempt any other classification than that derived from the actual business of human life. Bohea tea, then, in the sense of all our revenue laws, means that article which, in the known usage of trade, has acquired that distinctive appellation. * * *

The true inquiry, therefore, is, whether, in a commercial sense, the tea in question is known and bought, and sold, and used, under the denomination of bohea tea.

The evidence in this case establishes that the involved merchandise is, in a commercial sense, known, and bought, and sold, and used, as squares or scarves, and that it is not known, and bought, and sold, and used, as handkerchiefs. When the principles announced in the *Two Hundred Chests of Tea, supra,* are applied to the facts in this case, they require a holding that the involved articles are not handkerchiefs, but scarves or squares.

In *Curtis* v. *Martin*, 44 U. S. 106, 11 L. ed. 516, Mr. Chief Justice Taney, speaking for the Supreme Court of the United States, said:

The question brought up by this exception cannot now be considered as an open one. In the case of The United States v. 200 Chests of Tea (9 Wheat., 438), the court decided that in imposing duties Congress must be understood as describ-

ing the article upon which the duty is imposed according to the commercial understanding of the terms used in the law, in our own markets. This doctrine was re-affirmed in the case of The United States v. 112 Casks of Sugar (8 Peters, 277), and again in 10 Peters, 151, in the case of Elliott v. Swartwout. It follows that the duty upon cotton bagging must be considered as imposed upon those articles only which were known and understood as such in commerce in the year 1832, when the law was passed imposing the duty.

In the case before us, the Circuit Court followed the rule of construction above stated, and it has been followed also in every circuit where the question has arisen.

The involved merchandise was not known and understood as handkerchiefs in commerce in 1930, when the law was passed imposing duty upon handkerchiefs. Under the *Curtis* case, *supra*, duty upon handkerchiefs must be considered as imposed upon those articles only which were known and understood as handkerchiefs in 1930. It, therefore, logically follows that the involved merchandise cannot be classified as handkerchiefs for that reason. Nor is that all. The weight of the evidence establishes that the involved merchandise has never, to the present day, been known, and bought, and sold, and used, as handkerchiefs. There is, therefore, nothing which would require or justify the classification of the involved merchandise as handkerchiefs.

Of course, if the involved merchandise were not in existence at the date of the passage of the present tariff act, but had come into existence since that date, and if, on the date of importation, it were known, and bought, and sold, and used, as handkerchiefs, its classification as handkerchiefs would be required under the principle that tariff laws are made for the future as well as for the present. *Wilhelm Pickhardt v. Edwin A. Merritt*, 132 U. S. 252, 33 L. ed. 353, and *Newman v. Arthur*, 109 U. S. 132, 27 L. ed. 883. That, however, is not the situation in this case.

Since the involved merchandise cannot find classification as handkerchiefs under paragraph 1209 of the Tariff Act of 1930, there remains for determination its proper classification. The merchandise was classified as being wholly or in chief value of silk. This classification is presumptively correct, and, there being no evidence to the contrary, we accept as correct that part of the collector's action in classifying the merchandise as being wholly or in chief value of silk. As heretofore stated, the involved merchandise is used by women and girls as articles of wearing apparel. Defendant's witnesses do not contradict this fact. Even if the involved merchandise were used as a handkerchief, it would still be an article of wearing apparel, *eo nomine* provided for as handkerchiefs. The fact that it is not *eo nomine* provided for does not destroy its proper classification as articles of wearing apparel, but simply relegates it to that class of articles of wearing apparel, not specially provided for.

Upon a full consideration of the record and the briefs of counsel filed herein, for the reasons heretofore stated, we hold the merchandise covered by the two suits listed in said schedule "A," which was classified as "hemmed silk handkerchiefs, valued at not more than $5.00 per dozen," and assessed with duty at 60 per centum ad valorem under paragraph 1209 of the Tariff Act of 1930, to be properly dutiable at 35 per centum ad valorem under paragraph 1210 of the Tariff Act of 1930, as modified, *supra*, as alleged by the plaintiffs.

To the extent indicated, the specified claim in these suits is sustained; in all other respects and as to all other merchandise, all the claims are overruled. Judgment will be rendered accordingly.